300 Ga. 562
FINAL COPY

S16A1509.  McKINNEY v. THE STATE.

N AHMIAS, Justice.

Appellant Roy McKinney was convicted of the malice murder of his wife,
Shaquilla Weatherspoon, and cruelty to children in the third degree for beating
Weatherspoon in the presence of their six-year-old daughter.  His only
contention on appeal is that the evidence presented at trial was insufficient to
support his murder conviction.  We affirm.[1]

1.     Viewed in the light most favorable to the verdicts, the evidence
presented at trial showed the following.  On Sunday, June 2, 2002, at 1:45 a.m.,
Appellant called 911 and said that his wife had been missing since the night of

---

[1]  The crimes occurred on the night of May 31, 2002.  On December 10, 2003, a Fulton
County grand jury indicted Appellant for malice murder and cruelty to children in the first degree.
He was tried in February 2005 and found guilty on both counts.  After Appellant filed a motion for
new trial, it was discovered that the trial transcript had been lost.  As a result, the trial court entered
a consent order granting Appellant a new trial.  He was re-tried from September 21 to 28, 2011, and
the jury found him guilty of malice murder and of cruelty to children in the third degree as a lesser
included offense of cruelty to children in the first degree.  The trial court sentenced Appellant to
serve life in prison plus 12 consecutive months.  Appellant filed a timely motion for new trial, which
he then amended with new counsel on July 3, 2014.  The trial court denied the motion on October
6, 2014.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the
September 2016 term and submitted for decision on the briefs.

Friday, May 31. He gave the police the following account of the hours before she supposedly went missing.[2] Around 5:30 p.m. on May 31, Weatherspoon, who had recently finished her day job, picked Appellant up from his job in the car that she had rented for them after their family car was in an accident. When they arrived at their apartment, Weatherspoon got ready to leave for her night job at Grady Hospital. Meanwhile, Appellant walked to the corner store to buy a lottery ticket. When he returned home a little after 6:00 p.m., Weatherspoon had already left, locking him out of the apartment. He repeatedly called her, but she said she could not leave work to let him in. Appellant went to visit a friend in the apartment complex. They stayed outside, listening to music and drinking beer; Appellant drank four or five beers.

According to Appellant, Weatherspoon returned from Grady around 12:30 a.m., allowing him to get back into the apartment. She told him that she was going to a party at a co-worker's home and that she would not return that night because she would sleep at her mother's home, which was where their daughter was spending the night. Appellant argued with her, accusing her of going to

_____

[2] After calling 911, Appellant provided a written statement to a detective in the Atlanta Police Department's missing persons unit and then was interviewed by the detective. The written statement was read to the jury, and the recording of the interview was played for the jury.

meet a man. She then changed clothes while Appellant watched television. Weatherspoon left the apartment around 1:30 a.m. As she left, Appellant offered to help her with the bags she was carrying; she refused help, so Appellant told her to have a good time and did not go outside with her. That was the last time he saw or spoke to her. Appellant characterized his and Weatherspoon's relationship as "bizarre." He admitted that there had been affairs on both sides and that they had split up several times, but he said that they stayed together for the sake of their daughter.

As the police investigated Weatherspoon's disappearance, evidence emerged that contradicted Appellant's story in several key aspects. The friend with whom Appellant had been drinking, Antonio Brown, confirmed that they sat outside together from about 7:00 p.m. until 11:30 p.m., although Brown said Appellant drank six or seven beers. During that time, however, Appellant did not say anything to Brown about being locked out of his apartment. Furthermore, Brown's and Appellant's stories about what happened after they parted ways differed. Brown said that he saw Appellant again between 1:00 and 1:30 a.m. standing outside by the apartment mailboxes. The next day, Appellant told Brown that he had been outside at that time because he was locked out of

3

his apartment, even though Appellant told the police that Weatherspoon had returned and let him into the apartment by that time.

Another neighbor, Antwon Fallin, told the police that he saw Appellant and Weatherspoon pull into the apartment's parking lot in their rental car around 1:00 a.m. Appellant was driving, and Weatherspoon was slumped over in the passenger seat not moving. Although Appellant nearly hit Fallin, neither Appellant nor Weatherspoon said anything to him. Fallin found this strange because both usually spoke to him whenever they saw him. Fallin watched the car for the next five or ten minutes. It did not move from the place where it stopped in the parking lot, and no one got in or out.

One of Weatherspoon's friends and co-workers from Grady confirmed that she had invited Weatherspoon to a party that night. Weatherspoon said she would get to the party around 1:00 a.m., but she never arrived. Weatherspoon's mother said that Appellant called her around 1:30 or 2:00 a.m., asking if Weatherspoon was there and claiming that he was worried about her, even though based on the story Appellant gave the police, Weatherspoon was fine when she left for the party around 1:30 a.m.

Phone records supported Appellant's claim that he called Weatherspoon

4

repeatedly while she was working at Grady; in fact, he called her cell phone 51 times between 7:14 p.m. and just after midnight. The records undermined Appellant's claim that he was locked out of the apartment around 6:00 p.m., however, because a call was made at 7:13 p.m. from the landline inside Appellant and Weatherspoon's apartment to her cell phone.

Weatherspoon's friends and family corroborated Appellant's statement that Weatherspoon had affairs, mentioning three men specifically. These witnesses, however, painted a much darker picture of Appellant's relationship with Weatherspoon: it was not simply "bizarre"; it was obsessive and abusive. Three of Weatherspoon's close friends who worked with her at Grady said that Appellant was controlling and verbally abusive toward Weatherspoon. For example, he had hidden tape recorders in the apartment to monitor Weatherspoon, and he frequently checked her phone to discover if she was talking to any other men. He threatened to kill Weatherspoon if she ever left and told her that "if he couldn't have her, nobody would."

Weatherspoon's aunt and mother echoed what her friends said about Appellant's controlling and verbally abusive behavior, and added that Appellant's abuse of Weatherspoon was also physical. According to her aunt,

Weatherspoon said that Appellant slapped her and would grab her and throw her up against a wall. The aunt also once saw a handprint on Weatherspoon's face after Appellant had slapped her. Weatherspoon told her aunt that Appellant had said he could kill her without anyone ever knowing, and Weatherspoon also said: "If anything ever happens to me, Auntie, Roy killed me." According to her mother, Weatherspoon said that Appellant would "grab her and sling her around," that he grabbed her around her neck and arms, and that he slapped her face. The mother also saw evidence of this physical abuse, including bruises and scratches on Weatherspoon's neck, a handprint from a slap on her face, and a bruise on her arm. Weatherspoon's mother said that Weatherspoon and Appellant's daughter had called her twice to come over because Appellant was beating Weatherspoon. Appellant was arrested for simple battery of Weatherspoon in 1999. Their daughter also said that her parents fought a lot. She described two specific incidents of physical abuse that she witnessed, once when her father hit her mother's face with a closed hand and once when he got on top of Weatherspoon and hit her.

Weatherspoon's friends and relatives also said that Weatherspoon was unhappy in the relationship, had left a few times before but returned for the sake

of their daughter, and planned to leave again.  In December 2001, she pawned her wedding ring for $15, and in February 2002, she bought furniture on layaway to furnish her own apartment.  An expert on domestic violence testified for the State about the cycle of violence and opined that the most dangerous time for victims of domestic violence is when they try to leave the relationship, because the abuser fears losing control.  Other than the testimony about Appellant's abuse of Weatherspoon, there was no testimony that she had any physical or mental health problems.

On June 6, 2002, six days after she was last seen, Weatherspoon's body was discovered by a land surveyor in an area of woods hidden from the street near Greenbriar Mall, an area of Fulton County with which Appellant was familiar.  The body was in a state of moderate to advanced decomposition. Because of the level of decomposition and because there were no injuries to the victim's bones, the medical examiner was unable to determine a specific cause of death.  The only identifiable injury was a broken artificial fingernail. Because of the high concentration of insects on the victim's head, neck, and face, the medical examiner hypothesized that the victim suffered an injury to her head and neck, such as an asphyxial or sharp force injury.  He ruled that the

7

victim's manner of death was homicidal violence. The medical examiner concluded that the victim had been dead between three and seven days.

The items found on and around the victim's body indicated that she had not been sexually assaulted or robbed. Although her body was too decomposed to check for physical signs of sexual assault, her clothes were still on her and not torn. And although her Louis Vuitton purse apparently had been dumped out near her body and her wallet was empty, the purse and her credit cards were left near her body, and there had been no activity in her bank account. Several other items were also found nearby, including packing tape, a cigarette butt, and a hair pick, but these items could not be linked to Appellant or Weatherspoon or to the crime.

On the same day her body was found, Weatherspoon and Appellant's rental car was discovered in the Capitol Homes housing project, a high-crime area described as "nowhere near" Greenbriar Mall. The driver's side window had been broken, there was a rock on the floorboard of the driver's side, and there was glass outside the car, indicating that the car had been broken into at that location. A broken acrylic fingernail with a reddish stain was found in the right rear seat of the car; a bloodstain was found on the back of the driver's seat

8

headrest; and nine latent prints were lifted from the car. The stain on the fingernail was not tested for DNA. DNA testing later matched the bloodstain in the car to the DNA of T. F., who was 15 years old at the time of the crime and had no apparent connection to Weatherspoon or Appellant. None of the latent prints in the rental car was matched to Appellant.

Appellant was interviewed again after Weatherspoon's body and the rental car were found, and he gave a statement that was consistent with his earlier story.[3] He added that although his brother and Weatherspoon's mother had spare keys, he did not call them to ask for a key while he was supposedly locked out. Weatherspoon's mother testified, however, that Appellant did call her some time between 7:00 p.m. and midnight seeking a key, but she did not give him one.

All of this evidence was presented at trial. Appellant did not testify.

2. Appellant raises only one enumeration of error, asserting that the evidence at trial was insufficient to support his conviction for malice murder,

---

[3] This statement was not recorded but was briefly recounted at trial by the interviewing officer.

citing both former OCGA § 24-4-6[4] and <u>Jackson v. Virginia</u>, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). We disagree. The evidence summarized above was legally sufficient for the jury to exclude every reasonable hypothesis other than Appellant's guilt. See former OCGA § 24-4-6; <u>Simmons v. State</u>, 291 Ga. 705, 706 (1) (733 SE2d 280) (2012) (explaining that "[w]hether the evidence excluded every other reasonable hypothesis but that of guilt is a question for the jury" and an appellate court "will not disturb the jury's verdict unless it is insupportable as a matter of law" (citation omitted)). And while the evidence was circumstantial, it was easily sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Appellant was guilty of malice murder. See <u>Jackson</u>, 443 U. S. at 319; <u>Simmons</u>, 291 Ga. at 706 (1).

Although no witnesses observed Weatherspoon's death and the medical examiner could not identify the exact cause of death, there was sufficient evidence to conclude that she was murdered. Among other things, "when she was last seen alive, [she] was 'in apparent good health, and with nothing to

---

[4] Georgia's old Evidence Code was still in effect when this case was tried in September 2011. Former OCGA § 24-4-6 said, "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." This provision was carried forward in the new Code as OCGA § 24-14-6.

show any mental disturbance,'" and her body was found hidden in a wooded area a considerable distance from where her car was abandoned. Benson v. State, 294 Ga. 618, 621 (1) (754 SE2d 23) (2014) (citation omitted). See also Currier v. State, 294 Ga. 392, 394 (1) (754 SE2d 17) (2014) ("Pretermitting whether the doctor's expert opinion itself would support a conviction, it is not the doctor's expert opinion . . . alone, but the totality of the evidence that must be sufficient to convince the trier of fact beyond a reasonable doubt." (citation and punctuation omitted)).

The jury also was entitled to disbelieve Appellant's version of the events preceding Weatherspoon's death, particularly because, as explained above, his story conflicted with much of the other evidence. Most significantly, Appellant claimed that the victim was in their apartment from 12:30 a.m. until 1:30 a.m. and that he did not leave the apartment after 12:30 a.m., but Appellant's neighbor Fallin saw him in the rental car with the victim, who was slumped over and not moving, at 1:00 a.m. The jury could instead believe the testimony and other evidence indicating that Appellant was a controlling and obsessive husband with a history of spousal abuse who killed Weatherspoon during an argument after a night of drinking. See Vega v. State, 285 Ga. 32, 33 (1) (673

11

SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations omitted)).

Appellant makes much of the fact that DNA extracted from the bloodstain on the back of the driver's seat headrest in the abandoned car belonged to T. F. rather than Appellant and that Appellant's fingerprints did not match any of the nine latent prints found in the car. However, the State presented a reasonable theory that the presence of T. F.'s blood was the result of an unrelated break-in of the vehicle after it had been abandoned in Capitol Homes, and no evidence linked T. F. and the victim. And because the vehicle was a rental car, the presence of unidentified prints was to be expected. As for Appellant's argument that the jury should have acquitted him because evidence gathered from near the body and from the car was not tested for matches to the three men with whom the victim had affairs, two of the men were specifically ruled out as suspects during the investigation, there was no evidence that any of these affairs was on-going at the time of the murder, and phone records did not show any calls between the men and Weatherspoon on the night of her death.

In sum, the evidence was sufficient for the jury to find that Appellant

murdered his wife. And while not disputed by Appellant, we have also reviewed the evidence supporting his conviction for third-degree cruelty to his child, and we conclude that it was sufficient as well. See Jackson, 443 U. S. at 319.

Judgment affirmed. All the Justices concur.

Decided February 27, 2017.

Murder. Fulton Superior Court. Before Judge Markle.

Stephen R. Scarborough, for appellant.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Marc A. Mallon, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth M. Haase, Assistant Attorney General, for appellee.