306 Ga. 69
FINAL COPY

S19A0343. JACKSON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Jaramus Jackson was convicted of felony murder and a firearm offense in connection with the fatal shooting of Carlos Wallace in 2015. Appellant contends that the evidence presented at his trial was insufficient to support his convictions; the trial court erred by allowing the State to present evidence under OCGA § 24-4-404 (b) that Appellant had shot at someone else in 2005 and the trial court improperly instructed the jury on how to consider this evidence; the trial court erred in failing to give various jury instructions and his trial counsel was ineffective in failing to ask for them; the trial court erred by preventing the defense from cross-examining accomplice witness Ronney Jackson about his 1997 arrest for murder, the State committed a *Brady* violation by failing to timely disclose the 1997 arrest, and trial counsel was ineffective in failing to question Ronney about the arrest and to object to the

*Brady* violation; trial counsel failed to convey the State's proposed sentence recommendation if Appellant pled guilty; and trial counsel was ineffective in failing to object to certain questions asked during his cross-examination. Although it takes many pages to work through all these claims, we find no reversible error. Accordingly, we affirm.[1]

    1. Viewed in the light most favorable to the verdicts, the

---

[1] Wallace was shot on November 25, 2015, and died as a result of complications from his gunshot wound on December 19, 2015. On July 6, 2016, a Clayton County grand jury indicted Appellant and Ronney Jackson for malice murder; three counts of felony murder; the underlying felonies of aggravated assault, criminal damage to property in the first degree, and aggravated battery; and possession of a firearm during the commission of a felony. Ronney entered a negotiated guilty plea to the aggravated assault count in September 2016 and was sentenced to serve 20 years (two in confinement, three on probation, and a suspended sentence of 15 years conditioned upon truthful testimony against Appellant). Appellant was then tried from January 9 to 13, 2017. The jury found him not guilty of malice murder but guilty of all the other counts. The trial court sentenced him to serve life in prison without the possibility of parole for felony murder based on aggravated assault plus five years for the firearm offense. The other two felony murder counts were vacated by operation of law, and the trial court purported to merge the remaining counts; the State has not challenged the sentences. See *State v. Dixon*, 302 Ga. 691, 698 (808 SE2d 696) (2017). On February 9, 2017, Appellant filed a motion for new trial with new counsel. Over the next year, he filed numerous amended and supplemental motions for new trial, and the trial court held evidentiary hearings on February 6 and 21, 2018. On April 23, 2018, the trial court denied the motion for new trial. Appellant filed a timely notice of appeal to this Court, and the case was docketed to the term beginning in December 2018 and submitted for decision on the briefs.

evidence presented at Appellant's trial showed the following. Appellant and his cousin Ronney worked together at Brenntag Mid-South, an industrial chemical distributor in East Point. Ronney had a 15-year-old son who had a tense relationship with Wallace, the victim. In early 2015, Ronney's son and daughter lived with their mother, Candice Lowery, and Wallace. Lowery and Wallace also had a child together. In mid-2015, Wallace refused to let Ronney's son continue living in their home, and the son then moved in with Ronney. On November 24, 2015, Ronney's son and Wallace had an altercation that involved "hand to hand combat." Ronney and Wallace exchanged verbal threats after the fight. On the morning of November 25, while Appellant and Ronney were both at work, Ronney's son called Ronney and said that Wallace and four other guys were at the car wash where the son was working.

According to Ronney's trial testimony and a statement he made to the police after his arrest, he then asked Appellant to tell his supervisor that he was taking an early lunch, but he and Appellant did not clock out. Appellant drove Ronney in Appellant's black

Mustang to the car wash to confront Wallace. As they arrived, Ronney saw Wallace get into a gold Malibu and drive away. Ronney told Appellant, "don't worry about it, I'll see him another time," but Appellant said, "[I] didn't drive all the way out here for nothing." The two men then followed Wallace's car for about two minutes until Wallace parked in the driveway in front of his house.

According to Ronney, Appellant parked his Mustang on the street, blocking half of the driveway, and Ronney got out of the car. Ronney walked up to the driver's side door of Wallace's car and banged on the car doors and windows. Ronney also tried to open Wallace's car door, but it was locked. Wallace, who was unarmed, started slowly backing his car out of the driveway while laughing. Appellant, who was standing behind the parked Mustang, then started shooting at Wallace. Wallace accelerated, backing over his mailbox and into a neighbor's yard across the street. Appellant took a few steps toward Wallace's car and continued shooting as Wallace drove away. Appellant and Ronney then got into the Mustang, and Appellant drove them in the opposite direction to return to

Brenntag.

Through the open blinds on his roommate's bedroom window, Ashton Holman saw Wallace's gold Malibu parked in the driveway in front of Wallace's house and a black Mustang parked near the street end of the driveway. Holman saw two black men who were outside the Malibu and one man sitting in the driver's seat. The first man outside the Malibu, a heavyset man wearing a white t-shirt and blue jeans, attempted to pull the driver out of his open car door while the second man stood next to the driver's door of the Mustang. The second man was slimmer and taller than the heavyset man. The second man also "appeared to have dredlocks [sic] or cornrows, or it might have been like a do-rag but he had something on his head," and he was wearing "some reflective pants and a dark shirt." Holman explained that the pants looked like mechanics overalls with a reflective stripe down the side.[2] When the Malibu began

_____

[2] Brenntag required its employees to wear navy uniforms with bright green reflective stripes. Ronney testified that on the day of the shooting, he wore a grey hoodie and blue work pants with reflective stripes. Appellant testified that he wore the same style of reflective pants and a navy jacket with

backing out of the driveway, the man standing near the Mustang started shooting at the car, and he continued shooting while the driver backed the Malibu over a mailbox and into another neighbor's yard. The shooter then stepped toward the Malibu and continued shooting as the car moved forward, turned right onto a nearby street, and drove away.[3] The two men then got into the Mustang, turned left on the same nearby street and drove away.[4] Brenntag was about a 20-minute drive from Wallace's home. Records from a thumbprint scanner at Brenntag showed that Appellant and Ronney clocked out together for their lunch breaks at 11:52 a.m.

One .40-caliber bullet had struck Wallace in the torso. He drove about two miles before crashing his car into a light pole. Someone

---

reflective stripes that day. Two of Appellant's co-workers testified that Appellant, who is a black man, often wore a black do-rag with black strings that hung down his neck.

[3] The police found three bullet casings in the yard next to the end of the driveway, one in the street very close to the driveway, and one in the street several feet from the driveway.

[4] Two people who heard the gunshots called 911, and the recordings of those calls were played for the jury. One caller said that he saw two black men who "had hoods on" speed off in a black Mustang. The other caller, a child, described the shooter as a black man wearing a black jacket with "green on it that said Nike," but did not mention seeing anyone else.

nearby called 911 at 11:31 a.m., and police arrived at the scene of the crash a few minutes later. An officer asked Wallace who shot him, and Wallace said it was his "baby's mother's other baby daddy" and spelled out the name "Q-U-A-N-Z-E-E Jackson." (Ronney, whose full name was Ronney LaQuanzee Jackson, was often referred to as "Quanzee.") Wallace was taken to a hospital, where he was put into a medically induced coma from which he did not awaken. In the ensuing weeks, Wallace underwent numerous surgeries, and doctors had to amputate both of his legs above the knees. He died of complications related to the gunshot wound on December 19, 2015.

Soon after the shooting, Appellant began driving his girlfriend's car to work instead of his Mustang. According to Ronney, he and Appellant talked about the shooting almost every day, and Appellant always took responsibility for the shooting. At some point, Charles Thompson, Appellant's supervisor at Brenntag, overheard Ronney tell Appellant, "I didn't know that you was going to start shooting," and Appellant respond, "cuz, I'm not going to let you go down for something I done."

Two weeks after the shooting, on December 9, the police questioned Ronney; he claimed that he was not at the scene of the shooting. On the morning of December 18, the police searched Appellant's residence. They found one live .40-caliber bullet inside a plastic tub and several items of reflective clothing. During the search, Appellant claimed that he did not own a gun or a black Mustang. That same day, Appellant made a phone call to Ronney, who put the call on speakerphone; the call was overheard by their co-worker Donald Jaffee. Appellant told Ronney that "folks had just left his house" and that Ronney needed to remove a box from the boiler room at Brenntag; Jaffee testified that he understood "folks" to mean the police. Appellant also called his supervisor Thompson to ask if he would be "willing to remove a weapon," but Thompson refused. That afternoon, Appellant went to the police station and admitted that he owned a black Mustang; he claimed that a mechanic had been looking at it during the search, but he refused to provide the mechanic's name. When the police arrested Ronney the next day, he told them that he was at the crime scene but Appellant

was the shooter.

On December 21, Jaffee reported the telephone conversation he had overheard to Arthur Welch, his supervisor. Jaffee and Welch then went to the boiler room and found a box that contained a .40-caliber Ruger handgun and .40-caliber bullets. Ballistics testing showed that this gun fired the bullet found in Wallace's body. The box had on it three fingerprints from Jaffee and one fingerprint each from Appellant, Welch, and the police officer who opened it. Appellant admitted that the gun was his.

At trial, Appellant testified as follows. He did not go with Ronney to confront Wallace and was not at Wallace's house at the time of the shooting. Although Appellant, who took pride in his Mustang, had never let Ronney or anyone else at Brenntag drive the car before, on the day of the shooting, he let Ronney borrow it to confront Wallace. Appellant was persuaded to do so because Ronney said his own car was almost out of gas, and he wanted to take a car that Wallace would not recognize. Appellant kept his .40-caliber Ruger in the Mustang's glove compartment. Before Ronney left that

morning, Appellant briefly got into the Mustang with Ronney to ensure that Ronney could drive a stick-shift, but he got out at Brenntag's back entrance before Ronney drove away.[5] Appellant knew when Ronney returned to work because he heard the Mustang's distinctive sound; Appellant then met Ronney in front of Brenntag and they clocked out for lunch together.

According to Appellant, several days later, Ronney called and told Appellant that he had shot Wallace. Appellant later saw Ronney remove the gun from the Mustang, wipe it down, and put it in a box, but Appellant did not know what Ronney did with the gun after that. Appellant handled many boxes during his work at Brenntag like the one bearing his fingerprint that contained the gun. At some point after Ronney removed the gun from the Mustang, Appellant called Jaffee's phone to speak with Ronney. Jaffee put the call on speakerphone, and Appellant told Ronney to get rid of the gun,

---

[5] Appellant and Ronney both testified that another co-worker tried to get in the car to accompany Ronney on the morning of the shooting. Ronney was not asked who that was; Appellant identified the co-worker as Jaffee and claimed that he saw Jaffee drive out of Brenntag's parking lot in another car soon after Ronney left.

which Appellant believed Ronney had hidden somewhere at Brenntag. During this conversation, Jaffee offered to melt the gun with a welding torch. Appellant denied making the incriminating statement to Ronney that his supervisor Thompson overheard, although he could offer no reason why Thompson would lie about that, other than vague speculation that Thompson thought Appellant played some role in getting him demoted.

Appellant argues that the evidence presented at trial and summarized above was legally insufficient to support his convictions. When properly viewed in the light most favorable to the verdicts, however, the evidence was sufficient for a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder and possession of a firearm during the commission of a felony. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). The jury was entitled to disbelieve Appellant's account of the events leading to Wallace's fatal shooting and to rely instead on, among other things, Ronney's testimony, the presence of Appellant's car and gun at the scene of the shooting along with a man matching

his description, and his incriminating statements and actions after the shooting. See *McKinney v. State*, 300 Ga. 562, 567 (797 SE2d 484) (2017). See also *Vega v. State,* 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation and punctuation omitted)).

2. Appellant contends that the trial court erred by allowing the State to present evidence under OCGA § 24-4-404 (b) that he shot at someone else a decade before the shooting in this case. Under OCGA § 24-4-404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence may be admissible for other purposes, including to prove intent. We hold that the trial court abused its discretion in admitting the 2005 shooting evidence, but we also conclude that this error was harmless in light of the other evidence of Appellant's guilt.

(a) Before trial, the State proffered police reports that showed the following. In January 2005, Appellant saw Jeffrey Swans leave

the apartment of Appellant's ex-girlfriend Chandre Sorrells, and Appellant then confronted Sorrells inside her apartment. Swans returned to the apartment when he saw Appellant go inside, and the two men argued. Swans then left the apartment, and Appellant followed him outside. After Swans got into his truck, Appellant shot at him as he drove away. Swans was not hit, although one bullet hit his rear fender and another hit his back tire. Appellant pled guilty to aggravated assault under the First Offender Act and received a 10-year probated sentence, which he completed before the shooting in this case.

At a hearing to determine the admissibility of the 2005 shooting evidence, the State argued:

> [The 2005 incident] involves the exact same intent to assault somebody that is leaving a crime scene in a vehicle, firing at a vehicle. This also happened at a location that was not [Appellant's] residence. And, he again transported a handgun — firearm to an area away from his residence where he used that handgun to fire at this man, Jeffrey Swans. The nature of the domestic dispute is a little bit different in that situation because it was more of a jealousy thing. . . . And, that intent being to commit an aggravated assault by firing a weapon at an occupied vehicle. In both incidents, occupied by men who

were unarmed and posed no threat whatsoever to [Appellant] and his willingness to assault individuals in that type of situation.

Over Appellant's objection, the trial court admitted evidence of the 2005 shooting solely for the purpose of proving Appellant's intent to commit the shooting in this case. The court ruled, however, that no one should refer to Appellant's "conviction" related to the shooting, because he received first-offender treatment so there was no conviction. Before the State called witnesses to testify about the 2005 shooting, the court gave the jury a limiting instruction, explaining that the evidence about to be presented was to be considered only "for a limited purpose." The court neglected to inform the jury what that purpose was, although the court told the jury that it would give more instructions later.[6] Swans then testified about the 2005 incident, giving an account consistent with the

---

[6] The court's instruction was, in full:

Sometimes evidence is admitted for a limited purpose. Such evidence may be considered by you, the jury, for the sole purpose for which the evidence is limited and cannot be used for any other purpose. The Court will give you additional instructions in this regard in the Charge of the Court prior to your deliberations.

State's proffer, and Appellant stipulated to a responding officer's written testimony, which was read to the jury, about finding two bullet casings in the parking lot.

When Appellant testified later in the trial, his counsel did not ask him about the 2005 shooting. On cross-examination, the prosecutor began his questions about the 2005 shooting by saying, "And I suppose it's just a coincidence that ten years earlier . . . Jeffrey Swans accused you of shooting into the vehicle while he was fleeing in a vehicle," to which Appellant responded, "Can you let me explain that situation, too?" Appellant said that he shot at Swans because he "was in love and made a bad decision," and he thought he saw Swans reaching for a weapon. The prosecutor asked Appellant to "demonstrate . . . how you pulled your gun out of your pocket and shot [at Swans]," and Appellant complied. The prosecutor then asked where Appellant was standing with the gun, and Appellant described the positions of the cars and demonstrated his position behind Swans's truck. The prosecutor continued to ask Appellant questions about the 2005 shooting, including asking again

whether it was a "coincidence" that Appellant shot at a retreating vehicle before and was now charged with killing someone by shooting at a retreating vehicle, and whether Appellant was mad at Wallace and "just lost his temper like [he] did back in 2005 with Jeffrey Swans."

As part of the jury charge given before deliberations began, the trial court instructed the jury on the admission of other-act evidence for a limited purpose, this time explaining that the limited purpose was to show Appellant's intent with regard to the crimes alleged in this case.[7] Closing arguments were not transcribed.

---

[7] The trial court gave the following instruction:
    Sometimes evidence is admitted for a limited purpose, ladies and gentlemen. Such evidence may be considered by the jury — by you, the jury, for the sole purpose for which the evidence is limited and not for any other purpose. In order to prove its case, the State must show intent. To do so, the State has offered evidence of another act allegedly committed by the accused. You are permitted to consider that evidence only insofar as it may relate to the State meeting its burden to show intent in this case and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes. The evidence may be considered only to the extent that it may show the element of intent that the State is required to prove in the crimes charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose. The defendant is on trial for the offenses charged in this Bill of Indictment only and not for any

(b) We review the trial court's decision to admit evidence under OCGA § 24-4-404 (b) for clear abuse of discretion. See *Kirby v. State*, 304 Ga. 472, 479 (819 SE2d 468) (2018). Evidence of an act extrinsic to the charged crimes is admissible if

> (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

Id. at 480. Appellant does not dispute that the State satisfied the third part of this test, so we will address only the first and second parts.

(i) Whether the evidence offered is relevant to an issue in the

---

other acts. Before you may consider any other alleged acts for the limited purpose stated, you must first determine whether the accused committed the other alleged acts. If so, you must then determine whether the act sheds any light on the elements of the offense for which the act was committed and the crimes — excuse me, the act was admitted in the crimes charged in the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence about other acts of the defendant. By giving this instruction, ladies and gentlemen, the court in no way suggests to you that the defendant has or has not committed any other acts, nor whether such acts, if committed[,] prove anything. This is solely a matter for your determination.

case other than the defendant's character is governed in large part by OCGA § 24-4-401, which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Appellant put his intent at issue by pleading not guilty, and he did not take any affirmative steps to relieve the State of its burden to prove intent. See *Olds v. State*, 299 Ga. 65, 72-75 (786 SE2d 633) (2016). Because the 2005 shooting and the aggravated assault (and resulting felony murder) charged in this case involved an assault with a deadly weapon, the 2005 shooting evidence was relevant to show intent. See *Olds*, 299 Ga. at 72 ("[E]vidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent[.]"). See also *Parks v. State*, 300 Ga. 303, 307 (794 SE2d 623) (2016).[8]

---

[8] Because the State offered the evidence of the 2005 shooting and defends it on appeal only as showing Appellant's intent in committing an aggravated assault by shooting at Wallace, we do not consider whether the evidence was relevant or probative to proving any of the other crimes with which Appellant was charged.

(ii) The second part of the admissibility test under OCGA § 24-4-404 (b) invokes OCGA § 24-4-403, which says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The major function of OCGA § 24-4-403 is to "exclud[e] matter of scant or cumulative probative force, dragged in by its heels for the sake of its prejudicial effect," and exclusion of evidence under the statute is "an extraordinary remedy which should be used only sparingly." *Hood v. State*, 299 Ga. 95, 102-103 (786 SE2d 648) (2016) (citations and punctuation omitted).

Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it. See *Kirby*, 304 Ga. at 481. As to similarity, the State addressed that factor at a general level, pointing out that both the 2005 shooting and the 2015 shooting at issue in this case involved Appellant's firing a handgun toward a car while it was

being driven away by a man who posed no immediate threat.

A more careful and granular comparison of the two incidents, however, reveals substantial differences between them — differences that the State failed to acknowledge. See *Brooks v. State*, 298 Ga. 722, 725-726 & n.10 (783 SE2d 895) (2016) (explaining that a "major difference" between Georgia's new Evidence Code and our old "similar transaction" case law is the need under OCGA § 24-4-404 (b) to consider the dissimilarities as well as the similarities between the extrinsic act and the charged act). In the 2005 shooting, the victim was a man who apparently was involved with Appellant's ex-girlfriend, and Appellant first argued with the man inside the ex-girlfriend's apartment before following him outside and shooting toward his truck as he drove away. By contrast, the victim here was a man who had a conflict with Appellant's cousin Ronney and Ronney's son; Appellant appears to have had no dispute with the victim before the shooting. And rather than occurring at a single location and acting alone as in 2005, in this case Appellant acted alongside Ronney and drove to two locations for Ronney to confront

the victim. These significant differences diminished the probative value of the 2005 incident.

The probative value was also diminished by the temporal remoteness of the prior shooting, which took place a decade before the crimes charged here, with Appellant not incarcerated during any of the intervening years. See *United States v. Pollock*, 926 F2d 1044, 1047-1048 (11th Cir. 1991) (explaining that the trial court has "broad discretion in determining if an extrinsic offense is too remote to be probative," but citing two cases holding that ten-year-old acts should have been excluded (citation and punctuation omitted)). Cf. *Kirby*, 304 Ga. at 484 (explaining that an 11-year gap between the prior and charged acts was not so remote "as to be lacking in evidentiary value," at least where the appellant was incarcerated for much of the intervening period (citation and punctuation omitted)).

Most telling, however, is the lack of any real prosecutorial need for the 2005 shooting evidence. All of the evidence at trial indicated that the person who repeatedly fired a gun toward Wallace had the requisite general intent to commit an assault with a deadly weapon.

See *Booth v. State*, 301 Ga. 678, 684 (804 SE2d 104) (2017) (explaining that assault with the "aggravating factor of use of a deadly weapon is a general intent crime").[9] Neither party ever contended that the shooting was unintentional. Thus, the prosecutorial need for this evidence was negligible as to the only purpose for which it was offered and admitted.[10] See *Jones v. State*, 301 Ga. 544, 548 (802 SE2d 234) (2017) ("Logically, if the State's

_____

[9] The jury was instructed that it could find Appellant guilty of the charged aggravated assault if, using a deadly weapon, he "attempted to cause a violent injury" to Wallace or if he "intentionally committed an act that placed [Wallace] in reasonable fear of immediately receiving a violent injury."

[10] Appellant *did* dispute that he was the other man with Ronney at the crime scene — the shooter. But that was an issue of *identity*, not intent, and evidence of the 2005 shooting was not admitted for that purpose and likely could not have been, because the degree of similarity required for extrinsic evidence to show identity is much greater than that required to show intent. See *Brooks*, 298 Ga. at 725 ("'[E]vidence offered to prove identity must satisfy a particularly stringent analysis. When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.'" (citation omitted)). There was also a genuine question as to *motive* — why Appellant would have shot Wallace, with whom Appellant apparently had no personal dispute. But again, evidence of the 2005 shooting was not admitted to show motive and likely could not have been, because Appellant's commission of a similar type of crime that shared the "all-too-common elements" of guns and cars is generally "not enough to show motive for the murder[] at issue." *Thompson v. State*, 302 Ga. 533, 540 (807 SE2d 899) (2017). In any event, the jury was instructed that it could consider the 2005 shooting only for intent. See id.

threshold to prove intent as an element of a crime is relatively low, as it likely is when the charged crime is one of general intent, then the probative value of the extrinsic act evidence would necessarily be minimal."); *United States v. San Martin,* 505 F2d 918, 923 (5th Cir. 1974) ("[P]rior crimes involving deliberate and carefully premeditated intent — such as fraud and forgery — are far more likely to have probative value with respect to later acts than prior crimes involving a quickly and spontaneously formed intent — such as assault . . . .").[11]

Considering all of the circumstances, the probative value of the 2005 shooting evidence to prove Appellant's intent was minimal at

---

[11] Compare *Kirby*, 304 Ga. at 486 (holding that a prior aggravated assault had minimal probative value as to intent because there was little if any need for extrinsic evidence to show that the victim, who had been stabbed multiple times, had been stabbed intentionally), and *Parks*, 300 Ga. at 307 (holding that a prior aggravated assault had no real probative value where the defendant admitted shooting the victim but claimed self-defense), with *Kirby*, 304 Ga. at 483 (explaining that the prosecutorial need to introduce a prior rape-related incident to show the defendant's intent was high because there was little other evidence supporting the charge of aggravated assault with intent to rape), and *Castillo-Velasquez v. State*, 305 Ga. 644, 649 (__ SE2d __) (2019) (explaining that the prosecutorial need for other act evidence of intent was high because the defendant claimed that his delusions negated his criminal intent).

best. On the other side of the OCGA § 24-4-403 balance, it is undoubtedly prejudicial to be labeled a short-tempered shooter in a murder case based on an unprovoked shooting. And the prosecutor enhanced the prejudice by extensively questioning Appellant about the 2005 incident. Indeed, the State's questioning seemed designed to use the evidence for reasons it was not admitted to be used — to establish Appellant as someone with a violent character who was with Ronney and who shot at Wallace simply because he has a bad temper and shoots at people in cars, which could not be "just a coincidence." In addition, no evidence was presented that Appellant had been prosecuted, admitted his guilt, and served a ten-year term of probation for the 2005 shooting. That increased the risk that the jury would want to punish Appellant for his past conduct rather than only for the charged crimes. See *Kirby*, 304 Ga. at 485.

In sum, the unfair prejudice from the other act evidence clearly and substantially outweighed its minimal probative value, and the trial court therefore abused its discretion by admitting the evidence.

See *Kirby*, 304 Ga. at 481; *Parks*, 300 Ga. at 307.[12]

(c) Although the evidence of the 2005 shooting should not have been admitted, that error was harmless in light of the array of other strong evidence demonstrating Appellant's guilt. The error was evidentiary and not of constitutional dimensions, and "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby*, 304 Ga. at 478 (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "'In determining whether the error was harmless, we

---

[12] Given our finding of error under OCGA § 24-4-404 (b) in this and other recent cases, it is worth emphasizing that our holding in *Jones* that other act evidence may be *relevant* to proving the general intent element of a charged crime, see 297 Ga. at 160-161, when applied to the many violent crimes that require only general intent, should not be viewed by prosecutors or trial courts as an open invitation to admit evidence of marginally similar violent acts that involve the same general intent. Because general intent is not meaningfully disputed in many cases, while evidence that the defendant committed other violent acts is often quite prejudicial, trial courts should be especially careful in conducting the OCGA § 24-4-403 balancing in this context. Prosecutors and courts should also be wary of the temptation to use evidence that was admitted solely to show intent for other purposes, such as to argue identity or motive. As discussed in footnote 10 above, admitting evidence for those purposes requires different considerations than admitting evidence to show intent.

review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.'" *Kirby*, 304 Ga. at 478 (citation omitted).

Although Appellant asserts in his brief that the evidence of the 2005 shooting was harmful because the "State made much of" this evidence at trial, he refers only to the testimony about the incident that the State elicited. Closing arguments were not transcribed, but Appellant does not contend that the prosecutor emphasized (or even mentioned) the improperly admitted evidence in his closing argument. Compare *Thompson*, 302 Ga. at 542 (holding that an error in admitting evidence under OCGA § 24-4-404 (b) was harmful in part because the State emphasized the evidence in closing argument). The prosecutor did not need to rely on the 2005 shooting in his closing argument, because there was solid direct evidence that Appellant shot Wallace: Ronney's detailed testimony and prior consistent statement to the police, as well as the essentially unimpeached testimony of Appellant's supervisor Thompson, who overheard Ronney tell Appellant, "I didn't know that you were going

to start shooting," and Appellant reply, "cuz, I'm not going to let you go down for something I done."

In addition, there was compelling circumstantial evidence of Appellant's involvement in the shooting. Appellant conceded that his Mustang and his .40-caliber Ruger were used in the shooting, and his testimony seeking to separate himself from his car and gun at the time of the shooting was strained at best. Appellant also admitted that he stopped driving the Mustang to work shortly after the shooting, initially lied to the police about the car, and helped hide the gun after the shooting, including telling Ronney and his supervisor to move the gun after the police searched his house.

Moreover, Holman and a 911 caller said that they saw two men besides the victim at the crime scene. Holman's description of the shooter as a black man with "something [like a do-rag] on his head" matched the testimony of Appellant's co-workers that Appellant often wore a black do-rag, and Holman's description of the shooter's clothes matched the uniform that Appellant admitted he was wearing on the day of the shooting. Appellant also admitted that he

was in his Mustang with Ronney shortly before the shooting and met up with Ronney immediately after the shooting, and there was no substantial evidence that anyone other than Appellant was with Ronney during the intervening minutes.

We recognize that Wallace told a responding officer that Ronney shot him, but according to Holman (and consistent with Ronney's account), the shooter was positioned by the Mustang at the end of the driveway, behind Wallace's car, so Wallace may never have seen Appellant and thus — reasonably but incorrectly — may have assumed that the man who was arguing with him immediately before the shooting was the shooter. We also recognize that the child who called 911 described the shooter as a black man wearing a black jacket with "green on it that said Nike," but jurors could reasonably construe that testimony as referring to a green reflective stripe on Appellant's navy jacket.

In sum, given the overall strength of the other evidence of Appellant's guilt, we conclude that it is highly probable that the erroneously admitted evidence of the 2005 shooting did not

contribute to the jury's verdict. See, e.g., *Kirby*, 304 Ga. at 481; *Manning v. State*, 303 Ga. 723, 726 (814 SE2d 730) (2018); *Parks*, 300 Ga. at 308.

3. In a related enumeration, Appellant contends that the jury was not properly instructed on how to consider the evidence of the 2005 shooting. Appellant asserts first that the jury was never told that it could consider the evidence only to prove intent. As discussed above, the trial court's initial limiting instruction, given just before the jury heard the evidence about the 2005 shooting, was obviously incomplete; it told the jurors that their consideration of the evidence was limited to a sole — but unidentified — purpose.

At the end of that instruction, however, the jury was told that it would receive additional instructions on the matter before beginning deliberations, and, as promised, the jury was instructed in detail in the final charge that it could consider the evidence only with regard to the issue of intent. Appellant seems simply to have overlooked this additional instruction in making his argument. Although it certainly would have been preferable for the trial court

to identify the limited purpose of the evidence in the initial instruction, "'[w]hen considering whether error exists in the instructions to the jury, this Court considers the instructions as a whole.'" *Manning*, 303 Ga. at 727 (citation omitted). So viewed, Appellant's argument fails.

Appellant also argues that the trial court should have instructed the jury that, before considering the other act evidence to prove intent, the jury must first find beyond a reasonable doubt that Appellant committed the acts alleged in the indictment. Appellant did not request such an instruction at trial, so we review this claim only for plain error. See OCGA § 17-8-58 (b) ("Failure to object [to the failure to charge the jury] shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. . . ."). "An error cannot be plain where there is no controlling authority on point." *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (818 SE2d 552) (2018) (citation and punctuation omitted). Appellant cites two federal cases in support of his argument. In both of those

cases, the court approved in a footnote an instruction along the lines of the one he now claims was necessary, but in neither case did the court say (much less hold) that this specific instruction was *required*. See *United States v. Arbane*, 446 F3d 1223, 1226 n.4 (11th Cir. 2006); *United States v. Beechum*, 582 F2d 898, 917 n.23 (5th Cir. 1978). Nor have we found any controlling precedent that so holds. Accordingly, although an instruction of this sort would not be an incorrect statement of law — and might even be helpful in clarifying the limited use of extrinsic evidence of intent — current Georgia law does not require that such an instruction be given, so Appellant has failed to show plain error. See *Herrera-Bustamante*, 304 Ga. at 264.

4. Appellant contends that the trial court should have instructed the jury that accomplice testimony must be corroborated, pursuant to OCGA § 24-14-8, which says:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

Because Appellant's counsel did not request an accomplice corroboration instruction at trial, Appellant raises the claim as plain error and ineffective assistance of counsel.

(a) We use a four-part test to evaluate a claim of plain error:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.

*Hawkins v. State*, 304 Ga. 299, 302 (818 SE2d 513) (2018) (citation and punctuation omitted).

There was clearly evidence that Ronney was Appellant's accomplice; indeed, Ronney was indicted as a party to the crimes, and he acknowledged to the jury that he had pled guilty to the aggravated assault of Wallace. Thus, the trial court's failure to give

an accomplice-corroboration instruction was a clear and obvious error, see *Hawkins*, 304 Ga. at 303, and Appellant did not affirmatively waive the error.

But even a *clear* error is *plain* error only if it likely affected the outcome of the proceedings. See *Hawkins*, 304 Ga. at 303. Unlike in cases where we have found the absence of an accomplice-corroboration instruction to be plain error, see, e.g., *State v. Johnson*, 305 Ga. 237, 240 (824 SE2d 317) (2019); *Stanbury v. State*, 299 Ga. 125, 130 (786 SE2d 672) (2016), in this case the trial court did *not* instruct the jury that the testimony of a single witness is generally sufficient to establish a fact, thereby inviting the jury to convict solely on the basis of the accomplice's testimony.

Moreover, the trial court correctly charged the jury on related legal principles. See, e.g., *Raines v. State*, 304 Ga. 582, 591 (820 SE2d 679) (2018) (discussing similar instructions in this context). The jury was advised that the State had the burden of proving every material allegation beyond a reasonable doubt and the defendant was presumed innocent until proven guilty. The jury was also

instructed that a witness may by impeached by disproving the facts to which the witness testified and that the jury must determine the credibility of witnesses and in doing so may consider factors including the witnesses' manner of testifying, their means and opportunity of knowing the facts about which they testified, the nature of the facts about which they testified, the probability or improbability of their testimony, their interest or lack of interest in the outcome of the case, and their personal credibility. Thus, the jury was advised by the court of circumstances that could undermine Ronney's credibility, and among other things the jury heard Ronney admit that he first told the police a story inconsistent with his trial testimony, that he had been indicted along with Appellant, and that he pled guilty to a single charge with a much lighter sentence.

Where the jury instructions were merely incomplete rather than overtly incorrect, we have not found plain error when there was substantial evidence corroborating the accomplice's testimony. As discussed in Divisions 1 and 2 (c) above, that is certainly the situation in this case, as there was ample evidence corroborating

Ronney's testimony that Appellant went with him to confront Wallace and ultimately shot Wallace. The absence of an accomplice-corroboration instruction therefore was not plain error. See, e.g., *Raines*, 304 Ga. at 591; *Robinson v. State*, 303 Ga. 321, 324 (812 SE2d 232) (2018); *Hawkins*, 304 Ga. at 303.

(b) Appellant also argues that his trial counsel was constitutionally ineffective in failing to request an accomplice-corroboration instruction. "To prevail on this claim, [A]ppellant must show both that his counsel performed deficiently and that, but for the deficiency, there is a reasonable probability that the outcome of his trial would have been more favorable." *Hampton v. State*, 302 Ga. 166, 170 (805 SE2d 902) (2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687-694 (104 SCt 2052, 80 LE2d 674) (1984)). We need not review both parts of this test if Appellant fails to prove one of them. See id. at 171.

"[T]his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." *Hampton*, 302 Ga. at 168-169. Thus, even if we

assume that trial counsel performed deficiently in not requesting an accomplice-corroboration instruction,[13] Appellant has not shown prejudice for the reasons explained in the previous subdivision.

5. Appellant raises three more claims related to jury instructions that he contends should have been given but were not — instructions on party to a crime, obstruction and accessory after the fact, and good character. Again, none of these instructions were requested at trial, so Appellant raises the claims as plain error and ineffective assistance of counsel.

(a) *Party to a Crime.* The indictment, which charged Appellant and Ronney "individually and as parties concerned in the

---

[13] But cf. *Manner*, 302 Ga. at 884 (explaining that trial counsel reasonably withdrew her request for an accomplice-corroboration instruction because she was concerned that the instruction would suggest that the person she was trying to paint as the shooter was an accomplice to the appellant); *Huff v. State*, 300 Ga. 807, 813 (796 SE2d 688) (2017) (explaining that trial counsel reasonably chose not to request an accomplice-corroboration charge because the defense strategy was focused on showing that there was no connection between the appellant and the alleged accomplice). Compare *Fisher v. State*, 299 Ga. 478, 485 (788 SE2d 757) (2016) (holding that not requesting an accomplice-corroboration instruction was an unreasonable strategy in light of the trial court's decision to give a single witness instruction and the defense theory that the accomplice was trying to shift blame from himself and should not be believed).

commission of a crime" for each offense alleged, was read to the jury at the outset of the trial and again before deliberations. In light of the indictment and the substantial evidence that Appellant and Ronney acted together at least to some extent, the jury probably should have been charged on what it means for a defendant to be a "party" in the commission of a crime. But Appellant has not shown that the omission of this instruction likely affected the outcome of the trial.

OCGA § 16-2-20 explains that a person can be convicted of a crime not only if he "[d]irectly commits the crime," but also if he "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." Id. (b) (1), (3), (4). Moreover, the jury may infer the shared criminal intent necessary to prove that the defendant was a party to a crime from his "presence, companionship, and conduct" with another perpetrator "before, during, and after the crime." *Coley v. State*, 305 Ga. 658, 663 (__ SE2d __) (2019) (citation and punctuation omitted). In this way, an instruction on party to a

crime would have explained to the jury *more* theories that it could use to find Appellant guilty.

Although the jurors were told that Appellant and Ronney were indicted "individually and as parties," in the absence of an instruction describing the expansiveness of party-to-a-crime culpability, and given the strong evidence that Appellant — not Ronney or anyone else — fired the shots at Wallace, the jury likely found Appellant guilty because it concluded that he shot Wallace. Appellant has not shown that the jury likely would have reached a different verdict if it had been instructed that it could also find him guilty if, for example, he merely intentionally aided or encouraged Ronney in the shooting. Accordingly, Appellant's claim of plain error based on the omission of this jury instruction fails, as does his related claim of ineffective assistance of counsel, see *Hampton,* 302 Ga. at 168-169.

(b) *Obstruction and Accessory After the Fact.* Appellant was not indicted for accessory after the fact or any other obstruction of justice offense, but he now contends that evidence that he conspired

to hide the murder weapon tended to prove that he was an accessory after the fact. Appellant argues that in the absence of an instruction explaining that acting after a crime to help cover it up may constitute a separate crime, the jury may have convicted him of murder based on those post-shooting actions alone.

"The crime of being an accessory after the fact is not included within a charge for murder," however, "but is a separate offense in the nature of obstruction of justice." *Huckabee v. State*, 287 Ga. 728, 733 (699 SE2d 531) (2010). Because Appellant was not charged with accessory after the fact or any other obstruction offense, the trial court did not err (much less plainly err) by omitting an instruction about such an offense. See id. ("Since appellant was not charged with being an accessory after the fact, the trial court did not err when it refused to give a charge on accessory after the fact."). See also *Nalls v. State*, 304 Ga. 168, 181-182 (815 SE2d 38) (2018) ("[I]t is error to instruct on the crime of accessory after the fact merely on the [incorrect] premise that it is a lesser included offense of a murder charged in the indictment."). And because a jury instruction on

accessory after the fact was not warranted, "trial counsel cannot be found ineffective for failing to request it." *Vergara v. State*, 287 Ga. 194, 198 (695 SE2d 215) (2010) (citation and punctuation omitted).

(c) *Good Character*. Appellant asserts that he introduced evidence of his good character at trial, vaguely referring to several pages in the transcript where Appellant described his general job duties and testified that he had worked at Brenntag for over eight years before the incident, had been promoted, and took care of his stepdaughter. Appellant also argues that the State put his good character at issue when the prosecutor asked witnesses who worked at Brenntag whether they "liked" Appellant or had any "issues" with him, to which each witness responded that they either liked him or had no issues with him. Based on this evidence, he argues, the jury should have been instructed that evidence of his good character alone could provide reasonable doubt. See *State v. Hobbs*, 288 Ga. 551, 552 (705 SE2d 147) (2010) ("'Good character is a substantive fact at trial, and can by itself create reasonable doubt as to a defendant's guilt and lead to an acquittal.'" (citation omitted)).

We need not decide whether it was clear legal error for the trial court not to give such an instruction (although we doubt it), or whether Appellant's trial counsel was deficient in not requesting the instruction (although we again doubt it), because we have no doubt that a good character instruction would not have changed the outcome of Appellant's trial. Even assuming that the testimony to which Appellant points can be characterized as admissible evidence of his good character, it was so scant and nebulous that it would not likely have made any difference in the jury's verdict had the jury been told that such evidence alone could create reasonable doubt. See *Walker v. State*, 301 Ga. 482, 490 (801 SE2d 804) (2017). Accordingly, Appellant has failed to demonstrate plain error or ineffective assistance of counsel. See *Hampton*, 302 Ga. at 168-169.

6. Appellant raises four claims related to Ronney's arrest for murder in 1997. None of them have merit.

(a) During Appellant's trial, after the State's direct examination of Ronney, the prosecutor informed the court that Ronney had been arrested in 1997 for murder, but the charge was

ultimately dismissed; the State moved in limine to prevent Appellant from questioning Ronney about the dismissed charge during cross-examination. Appellant's counsel responded that the charge had not been dismissed, asserting that Ronney had simply not been indicted. No evidence was proffered to the court on this point. The court expressed its displeasure at the lateness of the State's motion, but indicated that it was leaning toward ruling that the arrest could not be used. The court did not make a definite ruling, however, and granted the defense's request to recess until the next day to allow time to research the issue.

The next morning, Appellant's counsel conceded that his research led him to conclude that because Ronney was never indicted for the 1997 murder, the defense could not use the arrest for impeachment unless Ronney opened the door. Given that concession, the trial court did not rule on the issue. Appellant's counsel then cross-examined Ronney at length, including about a different arrest and jail stay for domestic violence and a prior marijuana charge, but did not bring up the 1997 murder charge.

During the motion for new trial hearing, Appellant offered into evidence the statement Ronney gave to the police a few days after being arrested for murder in 1997, in which Ronney identified the shooter as a man called "Black." Ronney testified during the hearing that the charge against him was dismissed a few days after his arrest and that he never testified against anyone in connection with the 1997 incident. Appellant's trial counsel testified at the hearing that, in hindsight, showing that Ronney had previously "cut a deal" and testified in a murder case might have helped undermine Ronney's credibility, but counsel offered no evidence — at either the trial or the motion for new trial hearing — to support his apparent belief either that Ronney had negotiated a deal or that Ronney testified in connection with the 1997 arrest.

(b) Appellant presents multiple theories under which he claims the trial court should have admitted evidence of Ronney's 1997 arrest. Because Appellant's trial counsel did not assert any of these theories at trial, Appellant suggests that the admissibility of this evidence should be reviewed for plain error.

To begin with, the trial court never actually ruled on the admissibility or inadmissibility of Ronney's 1997 arrest, because after doing his own research, Appellant's trial counsel announced that he would not bring up the arrest, and he never did. But even if the trial court had ruled that Appellant could not ask Ronney about his 1997 arrest, Appellant's claim of plain error would fail. Appellant argues that showing that Ronney had testified against someone and escaped a murder charge once before would have shown that he was employing the same tactic in this case. The problem with that argument is that its premise is unsupported: there was at trial and remains today no evidence in the record that Ronney actually testified against anyone with regard to the 1997 murder. And we are not convinced that the jury's decision likely would have been affected if the jury had heard that many years earlier Ronney was arrested for murder but then promptly released with the charge dismissed — suggesting that the arrest was inappropriate — particularly because Appellant was allowed to elicit that Ronney had been arrested and jailed for a violent crime and also charged with a drug crime. Thus,

even assuming plain error review is available, Appellant has failed to establish plain error. See *Anthony v. State*, 303 Ga. 399, 407-408 (811 SE2d 399) (2018).

(c) Appellant also argues that his trial counsel was ineffective in not questioning Ronney about the 1997 arrest. This claim fails for the same reason just discussed: Appellant has failed to prove that the minimal impeachment value of evidence that almost two decades earlier Ronney was arrested but released within days without being indicted or testifying against anyone would have cast enough doubt on his testimony to create a reasonable probability that the result of Appellant's trial would have been different. See *Anthony*, 303 Ga. at 408 n.13.

(d) Appellant contends that the State committed a due process violation under *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by providing the information about Ronney's 1997 arrest to the defense during trial rather than before trial. However, OCGA § 35-3-34 (a) (2) makes the criminal history records of witnesses in a criminal case available to the defendant upon written

request, and we have accordingly held many times that *Brady* does not "require the prosecution to turn over to the defense criminal records of state's witnesses." *Ballard v. State*, 297 Ga. 248, 251 (773 SE2d 254) (2015) (citations and punctuation omitted).

(e) Finally, Appellant argues that his trial counsel was ineffective in failing to raise the *Brady* claim. Because, as we just explained, the *Brady* claim is meritless, this enumeration also fails. See *Blaine v. State*, 305 Ga. 513, 521 (826 SE2d 82) (2019) ("[T]rial counsel cannot be ineffective for failing to raise claims that would not have succeeded nor made any difference in the outcome of [the appellant's] case.").

7. Appellant contends that his trial counsel was ineffective in failing to timely convey to him that the State said it would recommend a sentence of life with the possibility of parole if he pled guilty. We disagree.

At the beginning of the first day of trial, the court asked the prosecutor what the State's sentence recommendation was. The prosecutor replied that the recommendation was life with the

possibility of parole for a guilty plea, but there was no recommendation if Appellant was convicted at trial. The court asked whether Appellant's counsel had conveyed that recommendation to Appellant, and counsel said that he had not. The court granted a 15-minute recess to allow counsel to discuss the recommendation with Appellant. There was no further discussion of the issue after the recess or during the remainder of the trial.

At the motion for new trial hearing, Appellant's trial counsel testified that when he discussed possible guilty pleas with Appellant, Appellant made it "crystal clear" that "he wasn't taking anything." Trial counsel added that he and Appellant discussed pleading guilty to receive the State's recommended sentence numerous times during trial, but Appellant indicated that he would not plead guilty even if the State agreed to reduce the charges to manslaughter. Appellant did not testify at the hearing.

Appellant asserts that his trial counsel was ineffective in not conveying the State's plea offer to him in advance of trial. For Appellant to show prejudice from his counsel's not conveying a plea

offer, however, he must show, among other things, "a reasonable probability that [he] would have accepted the earlier plea offer." *Missouri v. Frye*, 566 U.S. 134, 147 (132 SCt 1399, 182 LE2d 379) (2012). Appellant has not presented any evidence that he was inclined to plead guilty at any point. This enumeration is meritless. See *Brown v. State*, 291 Ga. 892, 898-899 (734 SE2d 23) (2012).

8. Finally, Appellant claims that his trial counsel was ineffective in failing to object to certain questions posed by the State during its cross-examination of him. "However, [Appellant] did not raise this ineffective assistance claim when [he] was represented by new counsel in [his] motion for new trial and the trial court did not rule on it, so the claim was not preserved for review on appeal." *Gomez v. State*, 301 Ga. 445, 460 (801 SE2d 847) (2017).

9. As recounted above, Appellant has raised numerous claims of ineffective assistance of counsel. Although we have evaluated each claim separately, we also recognize that "the effect of prejudice resulting from counsel's deficient performance is viewed cumulatively." *Grant v. State*, 305 Ga. 170, 178 (824 SE2d 255)

(2019). To that end, we conclude that the cumulative prejudice from any deficiencies assumed in Divisions 4 through 7 is insufficient to create a reasonable probability that the results of the proceedings would have been different in the absence of the deficiencies alleged.

Judgment affirmed. All the Justices concur.

Decided June 3, 2019.

Murder. Clayton Superior Court. Before Judge Carter.

R. Allen Hunt; John W. Kraus, for appellant.

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Jeffrey M. Gore, Jeffrey M. Hawkins, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.