312 Ga. 254
FINAL COPY

S21A0854. THOMPSON v. THE STATE.

LAGRUA, Justice.

Appellant Darcy Thompson was convicted of felony murder in connection with the shooting death of Tyrone Cochran. On appeal, Appellant's sole enumeration of error is that the trial court erred by denying his request to instruct the jury on the lesser offense of voluntary manslaughter.[1] For the following reasons, we affirm Appellant's conviction.

---

[1] The shooting occurred on March 15, 2017. In May 2017, an Emanuel County grand jury indicted Appellant for malice murder and felony murder. In October 2018, a jury found Appellant guilty of felony murder, and a mistrial was declared on the malice murder count. The malice murder count was later dismissed by the trial court upon a motion of the State. On April 17, 2019, the trial court sentenced Appellant to serve life in prison without parole. Appellant filed an untimely motion for new trial through trial counsel on May 20, 2019, which the trial court dismissed sua sponte as untimely on July 15, 2019. Appellant filed an amended motion for new trial through new counsel on October 22, 2019. On November 19, 2019, Appellant filed a motion for an out-of-time appeal, which was granted by the trial court on November 20, 2019. On October 28 and November 6, 2020, Appellant filed additional amended motions for new trial. On February 2, 2021, the trial court denied Appellant's motion for new trial. Appellant filed a timely notice of appeal on February 9, 2021, and the case was docketed to this Court's term beginning in April 2021 and submitted for a decision on the briefs.

1. The evidence presented at trial showed that in March 2017, Hikeara Clark had romantic feelings for two men — the victim, Tyrone Cochran, and Appellant. Clark met Cochran in September 2015, and after the two started dating, Clark and her four children moved into his house in Swainsboro. About nine months later, Clark and Cochran broke up, and Cochran moved out. In May 2016, Clark started dating Appellant, and she and her children moved into a house with him, also in Swainsboro. Clark soon became pregnant with Appellant's first child, a girl, who was born in early March 2017.

According to Clark, when she and Appellant started dating, Cochran became jealous and wanted her back. Clark testified that several verbal encounters occurred between the two men, and during these "run-ins," Cochran would sometimes threaten Appellant.[2] However, no physical fights ever occurred. Appellant likewise testified that Cochran consistently provoked and harassed

[2] The evidence presented at trial demonstrated that Cochran was several inches taller and much larger in stature than Appellant.

2

him over the ten-month period he was dating Clark, but Appellant always ran away from Cochran or simply "went the other way." Family members and friends also observed the tension between Cochran and Appellant because they both wanted to be with Clark.

According to Clark, on the morning of March 13, 2017, she and Appellant got into an argument, and Clark left their house with her children, including her newborn daughter, and went to Cochran's house. Later that morning, Appellant's sister went to Cochran's house and told Clark to go home because Appellant was planning to come to Cochran's house, presumably to bring Clark and her children back home.[3] Cochran then rented a hotel room for Clark because he had to go to work and did not want to leave her alone at his house. Clark went to the hotel, but shortly after arriving, she called Appellant and asked him to come pick her up. Clark testified that she "just didn't feel right" and wanted to go home with Appellant. Appellant and Clark returned to Appellant's home.

---

[3] Clark testified that she knew Appellant did not want his daughter around Cochran.

The following day, March 14, Clark borrowed Appellant's phone while he was asleep and sent a text message to Cochran, which she immediately deleted from Appellant's phone. The text stated that she was still in love with Cochran, that her "heart [was] with" him, and that she wanted to come back home to him. However, Clark remained with Appellant that night.

Around 2:30 p.m. on March 15, Appellant left Clark at his house and drove to a nearby convenience store, KT's, to meet with Stacia Burke, a woman he knew from the neighborhood, about selling his cell phone to her. Burke and her cousin, Haley Henry, drove to KT's together to meet Appellant. After arriving, Henry entered the store, and Burke got into Appellant's silver Highlander SUV to examine his cell phone. While Burke was in Appellant's SUV, she saw a red car drive around the store a couple of times and then slow down by Appellant's SUV. Appellant's mood changed as soon as he saw the red car. Having decided not to buy the cell phone, Burke got out of Appellant's SUV and got back into Henry's car, which was parked next to Appellant.

4

Around the same time, Henry was exiting KT's, and a red car "zoomed around" her, circled a couple of times around KT's, and slowed down by Appellant's SUV. Henry then saw the red car follow Appellant's SUV out of KT's parking lot. Henry got back into her car, and after a couple minutes, Henry and Burke heard what sounded like fireworks. Henry and Burke left KT's and observed the red car stopped in the road.

That same afternoon, Kathleen Ricks went to KT's on her way to work to pick up some food. She had just returned to her car when she heard gunshots. She ducked, and when she looked up again, she saw a red car stopped in the middle of the road.

Milton Ricks, Kathleen's nephew, was also in the parking lot of KT's around this time and heard gunshots. He noticed two vehicles parked closely together in the roadway — one in front of the other. The first vehicle, the make and model of which Milton could not recall, was parked directly in front of a red Charger. Milton testified that after the shooting stopped, the first vehicle sped off, almost running off the road. Milton called 911, but was too shocked to speak

coherently, so Kathleen took his phone and reported the shooting. Milton then walked over to the red car and looked inside the vehicle. The driver was still alive, shaking and trying to talk, but no sound was coming out of his mouth.

The police arrived and found a red Charger stopped in the roadway with numerous bullet holes in the front driver's side from the fender to the windshield. They observed Cochran in the driver's seat, with blood covering his chest, and noted what appeared to be bullet wounds in his shoulder, arm, and chest. Emergency personnel arrived and transported Cochran to the hospital, where he later died from his injuries. The police collected numerous shell casings from a .40-caliber handgun[4] around and inside Cochran's vehicle. Officers also obtained copies of video recordings from surveillance cameras from two nearby businesses. The recordings

---

[4] At trial, Clark testified that she had seen Appellant with a .40-caliber handgun prior to this incident, and Appellant also testified that he had a gun in his possession on the day of the shooting. Appellant stated that right after the shooting, he hid the gun in the woods near the house where he lived with Clark. Law enforcement officers later searched that area, but no weapon was ever recovered.

6

showed a red Charger and a silver Highlander driving to KT's before 2:30 p.m. on March 15, and the same two cars leaving the area a few minutes later — with the red car following closely behind the silver SUV.

Within minutes of the shooting, Appellant returned home and told Clark that he had shot Cochran. When Clark asked why, Appellant said he "got tired of [Cochran] messing with him." Appellant changed clothes and left the house on foot.

At about 3:00 or 4:00 the same afternoon, an acquaintance of Appellant's, Cordell Sutton, was driving from Swainsboro to his job on Jekyll Island. On the way out of town, Sutton saw Appellant walking down the road. Appellant stopped Sutton and asked for a ride to Statesboro. Sutton agreed and dropped Appellant off at his cousin's house in Statesboro that evening. The next day, March 16, after receiving a tip about Appellant's whereabouts, the police located him at an apartment in Statesboro and arrested him without incident.

At trial, Appellant admitted shooting Cochran. Appellant

testified that Cochran periodically followed Appellant and Clark when they were driving somewhere together, but on these previous occasions, Appellant would typically ignore Cochran and keep going. However, on the afternoon of March 15, Appellant testified that he was "in fear." Appellant stated that he did not see Cochran until Cochran's red Charger sped up behind Appellant's SUV as he was leaving KT's, and he could see Cochran in his rearview mirror "pointing something black at [him]." Appellant said Cochran was waving a black object and swerving behind him, telling him repeatedly to "stop the car." Appellant testified that he had previously been the victim of a shooting, sustaining gunshot wounds to his stomach and ribs that required surgery. Appellant said the prior shooting arose from a similar situation where someone was following him. Appellant said, "I knew if [Cochran] could have got his hands on me I woulda really been hurt." And, having previously been in a situation where he was followed and shot, Appellant said he had every reason to think it could happen to him again. Appellant testified that because he had a weapon on him, he got out

8

of the car and shot behind him, believing he saw a gun. He "wasn't going to take no chance." But, Appellant claimed he did not "aim on the shots [he] fired" — he just fired because he was "scared for [his] life." Appellant said he had never fired a weapon before that day and that he was not out looking for Cochran.

2. Appellant contends that the trial court erred by denying his request for a jury charge on voluntary manslaughter. We see no merit to this contention because the evidence did not support this charge.

At trial, Appellant submitted a written request to charge the jury on voluntary manslaughter. At the close of the evidence, the trial court informed the parties that it would not give the voluntary manslaughter charge because the evidence arguably supported a finding that Appellant shot Cochran in self-defense, not as the result of sudden passion, and the court would not give a charge that was unsupported by the evidence. Appellant objected, "preserving the issue for ordinary appellate review." *Beck v. State*, 310 Ga. 491, 496 (2) (852 SE2d 535) (2020).

9

> If there is any evidence, however slight, to support a properly requested charge of voluntary manslaughter, then the trial court must give it. But a charge on voluntary manslaughter is warranted only where it can be shown that the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise.

Id. at 496-497 (2) (citations and punctuation omitted).

Appellant argues that his testimony about being the prior victim of a shooting and believing that Cochran would shoot him on March 15, 2017, was "sufficient provocation to excite the passion for voluntary manslaughter," and the trial court erred in failing to give the corresponding charge.

"This Court has repeatedly held that neither fear that someone is going to pull a gun nor fighting prior to a homicide are types of provocation demanding a voluntary manslaughter charge." *Funes v. State*, 289 Ga. 793, 795 (2) (716 SE2d 183) (2011). Moreover, Appellant testified that he fired on Cochran because he was "scared for [his] life," and "acting out of fear is not the same as

10

acting in the heat of a sudden irresistible passion." Id. "[A]nd only evidence of the latter supports a voluntary manslaughter conviction." *Burke v. State*, 302 Ga. 786, 791 (2) (809 SE2d 765) (2018).

For these reasons, we conclude that there was "no error in the trial court's failure to instruct the jury that it might consider voluntary manslaughter as an alternative to felony murder." *Burke*, 302 Ga. at 791 (2).

*Judgment affirmed. All the Justices concur, except Colvin, J., not participating.*

Decided August 10, 2021.

Murder. Emanuel Superior Court. Before Judge Reeves.

*Sarah M. Prince*, for appellant.

*Kelly A. Weathers, District Attorney, John A. Fitzner III, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Parisia F. Sarfarazi, Assistant Attorney General*, for appellee.