NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 30, 2024

S24A0352. WARD v. THE STATE.

LaGrua, Justice.

Appellant James Graham Ward appeals his convictions for felony murder and other crimes related to two shootings that occurred on March 24, 2021—one of which resulted in the death of Brian Belin.[1] Ward contends on appeal that (1) the trial court erred

---

[1] On August 4, 2021, a Paulding County grand jury indicted Ward for the following counts: malice murder of Belin (Count 1); felony murder predicated on aggravated assault of Belin (Count 2); aggravated assault of Belin (Count 3); aggravated assault of Shadeja Rutledge (Count 4); aggravated assault of Jewell Porter (Count 5); aggravated assault of Russell Jones (Count 6); and possession of a firearm during the commission of a felony (Count 7). The grand jury also indicted Ward and his co-defendant Annias Brooks—individually and as parties concerned in the commission of a crime—for the following counts: aggravated assault of Belin (Count 8); aggravated assault of Rutledge (Count 9); aggravated assault of Porter (Count 10); aggravated assault of Jones (Count 11); and possession of a firearm during the commission of a felony— specifically, the aggravated assault of Rutledge (Count 12). Ward and Brooks were jointly tried from March 14 to March 23, 2022. At trial, the jury found Ward guilty on Counts 2, 3, 7, 8, and 12 and not guilty on the remaining counts. The jury found Brooks not guilty on all counts. The trial court sentenced Ward to life in prison without the possibility of parole on the felony murder count (Count 2), plus a total of 20 consecutive years to serve for Counts 7, 8, and 12. The aggravated assault count (Count 3) merged with the felony murder count

in denying his request to charge the jury on voluntary manslaughter because there was "some evidence" to support such a charge; (2) the trial court erred in denying his motion for a directed verdict on Count 8 (aggravated assault) and Count 12 (possession of a firearm during the commission of a felony) because those counts were not supported by the evidence and because his convictions on those counts constituted repugnant verdicts since he was acquitted of the other aggravated assault charges based on the same conduct; and (3) his trial counsel rendered ineffective assistance by agreeing to the trial court's ruling on the State's motion in limine and by failing to file a "reverse 404 (b) motion" under OCGA § 24-4-404 (b) related to Belin's propensity to carry firearms because this evidence was relevant to Ward's self-defense claim and prejudiced his ability to

---

(Count 2) for sentencing purposes. Ward filed a timely motion for new trial, which he later amended through new counsel on January 9, 2023 and April 17, 2023. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on August 21, 2023. Ward filed a timely notice of appeal to this Court on September 8, 2023, and the case was docketed to the December 2024 term of this Court and submitted for a decision on the briefs.

2

support this defense at trial. Seeing no merit to these claims, we affirm Ward's convictions.

The evidence presented at Ward's trial, viewed in the light most favorable to the verdicts, showed that, prior to the shootings on March 24, 2021, Belin was spending the evening with his girlfriend, Shadeja Rutledge, and a few friends. Rutledge, who started dating Belin in 2020, had previously been in an "on-again/off-again" sexual relationship with Ward, which Ward described as "friends with benefits." Several months after Belin and Rutledge started dating, Belin was incarcerated, and during that timeframe, Rutledge and Ward saw each other again—but no more than "once or twice." When Belin was released from jail, he and Rutledge resumed their relationship.

On the evening of March 24, Belin and Rutledge went to the home of Russell Jones, a "close friend" of Belin's, who lived with his parents in the Regency Park subdivision. Belin, Rutledge, and Jones "decided [they] were going to chill at [Jones's] house" that night to

3

"drink and play music." The group left the house briefly to purchase liquor and pick up Rutledge's friend, Anisa Karim, and then returned to Jones's house. They were later joined by Jones's girlfriend, Jewell Porter. Around 8:00 p.m., Jones's parents came home, and his mother told the group to leave. According to Jones, he had previously gotten into trouble with his parents because Porter "was caught spending the night," and he was not allowed to have company at the house.

The group got into Belin's car. Belin drove to the common area of the subdivision—an area next to the entrance of the subdivision where the swimming pool and tennis courts are located—and he parked the car. Jones was very angry about being forced to leave his house, and he and Belin got out of the car while Belin tried to calm Jones down. Belin and Jones talked outside the car for about 10 or 15 minutes, and then, the two men started walking along a paved path leading from the common area to other homes in the subdivision. Rutledge, Karim, and Porter stayed in the car, listening

4

to music and talking. Rutledge testified that she did not see Belin and Jones walk away from the car, and according to Porter, she "los[t] sight" of where the men went.

As Belin and Jones were walking along the path, Jones heard "a [woman]'s voice coming from [a] house" adjacent to the common area, and Jones realized it was Ward's house.[2] Jones testified that he and Belin did not intentionally walk to Ward's house; they were "just walking and talking" when they heard a woman's voice and saw several people outside on the deck of the house, "playing music and stuff." Jones and Belin approached the fence running along the backyard of the house, and Belin asked the woman if Ward was home. She said Ward was not there. Jones testified that "a lot of people" from the house then came over to the fence and "started getting rowdy" and "making threats."

---

[2] The record reflects that, on March 24, 2021, Ward's mother, Stacy Mason, rented a house in the Regency Park subdivision, which backs up to the tennis courts and swimming pool in the common area. Mason testified that several of her children and her husband's children lived with her in this house, including Ward and his co-defendant Brooks.

Rutledge, Karim, and Porter—who were still sitting in Belin's car—heard "some noise" and "someone screaming," so they got out of the car and followed the path until they came upon Belin and Jones "arguing" and "talking to some dudes over the fence." Rutledge testified that she was concerned because Belin was "on probation" and was "extremely drunk," so she grabbed his hand and told him to come back to the car. Belin followed Rutledge towards the common area, but the rest of the group stayed at the fence. Jones testified that he was "still arguing" with the people on the other side of the fence, and Porter was telling him, "[L]et's go." Jones testified that he did not "trust the situation, so he didn't "want to turn [his] back" and walk away.

Ward's mother, Stacy Mason, testified that she was sitting in her bedroom talking to Ward on the evening of March 24 when it "came to [her] attention that something was going on outside of her house." Mason testified that Ward "got a phone call" around that time, and he answered the phone, "shook his head," and "went out

6

of the room." Ward and Mason went downstairs, at which point Ward exited "out the front door and [Mason] went out the back door" onto the deck. Mason testified that "[t]here was a lot of yelling over [their] fence," and "it was commotion just all in back of the fence." Mason said the people on the other side of the fence were "calling for" Ward, and she told them to leave.

Rutledge testified that, when she and Belin got back to the parking lot in the common area, "a car pull[ed] up, and [Ward] hop[ped] out." Ward approached Rutledge and Belin and "ask[ed] is there a problem," and she responded, "No. There ain't no problem." Ward then started shooting at Belin. Porter testified that she saw "someone come running up" to Belin and Rutledge in the parking lot of the common area and heard "shots go off." Porter said she could not identify the person who was shooting, but she saw the person "pointing at" Belin and saw Belin "go to the ground." Karim also testified that, while she was standing by Ward's backyard, she heard what she thought were "fireworks," and when she turned around,

7

she saw "someone shoot at someone and then quickly run away." She could not see who the shooter was, but she heard Rutledge screaming and yelling Ward's name "over and over again." Ward's sister, Amyris Avritte, testified that she was outside their home on the evening of March 24while an argument was going on at their backyard fence, and she saw a car pull into the common area and "heard shots."[3] Mason also testified to seeing a "dark car" pull into the common area parking lot and to hearing gunshots "over in the parking lot area."[4]

According to Rutledge, after Ward shot Belin, she ran to grab her phone out of Belin's car to call 911, at which point a second round of shots—which she assumed were intended for her—were fired. Porter and Jones testified that they also heard a second round of "shots pointed [their] way," and Porter realized she had been struck

---

[3] Avritte testified that she did not see Ward that night.
[4] According to Mason, Ward did not have a gun on him while he was in her bedroom that night and, "to [her] knowledge," did not own a gun.

with a bullet."[5] Karim similarly testified that, moments after the first shooting, she heard "shots go again," so she "duck[ed]," "roll[ed] over," and hid behind some bushes by the tennis courts.

Jones testified that, after Porter was struck, he picked her up to carry her back to the common area, and as he was doing so, he saw "Ward "hop into" a car, which went "peeling off" away from the common area and "out [of] the neighborhood." Rutledge also testified that she saw Ward "hop back into [a] car" in the common area, and Karim said she saw "a dark gray or a black van" in the common area "during the second shooting."

Rutledge and Karim called 911,[6] while Jones attended to Belin. Jones "took up [Belin's] shirt," saw "bullet wounds and blood squirting out," and tried to "do CPR and pump [Belin's] chest." Rutledge and Jones testified that Belin did not have a gun on him that night and that they did not know him to ever "carry a gun."

---

[5] Jones testified that a bullet "grazed" Porter's back.
[6] Recordings of the 911 calls were played for the jury at trial. During the phone calls, Rutledge and Karim identified Ward as the shooter.

9

Ronnie and Janelle Scogin, who lived in the Regency Park subdivision,[7] were at home around 8:30 p.m. on March 24 when they heard "seven or eight bangs" that sounded like "gunshots." The Scoginses stepped outside and "could hear young women crying really, really loud" and screaming for help. Ronnie hurried "towards the [common] area where [he] heard them crying," and "as [he] got to the sidewalk, . . . [he] saw a guy get in a silver SUV and then come down the road at a high rate of speed." Ronnie next saw a "black SUV Ford Explorer with New York plates" drive up "right behind" the silver SUV,[8] "heard several more shots," and saw the black SUV leave the subdivision, followed by the silver SUV "maybe a minute" later. Ronnie ran back to the house and yelled for Janelle to call 911. Janelle called 911 and advised the operator that there had been a shooting and that a black SUV with New York plates involved in

[7] The Scoginses' house was located a few houses away from the common area, between the house where Ward lived and the entrance to the subdivision.

[8] Mason testified that, during this timeframe, she was renting a silver or gray Nissan Pathfinder that Brooks was driving on March 24, and Ward was renting and driving a black Ford Explorer.

that shooting was driving out of the subdivision. The Scoginses had a motion-sensitive video camera installed on the front of their house, facing the street, which recorded the events of March 24. The video footage from the camera, which was played for the jury at trial, captured the sounds of multiple gunshots and screaming, followed by images of a black Ford Explorer and a silver Nissan Pathfinder driving towards the common area, the sound of more gunshots, and images of a black Ford Explorer and a silver Nissan Pathfinder driving away from the common area and out of the subdivision on the night of March 24. The Scoginses shared this video with the law enforcement officers investigating the case.

Around 8:30 p.m. on March 24, law enforcement officers with the Paulding County Sheriff's Office received a call regarding a homicide in the common area of the Regency Park subdivision. Detective Jacob Martin, one of the first responding officers, testified that:

> [o]nce I arrived on the scene, a female identified as Shadeja Rutledge ran down the hill screaming and saying

11

that her boyfriend had been shot in the head and he is dying. I ran up the hill area at the tennis courts and I observed that there was a male lying on the ground and he was bleeding with shell casings around him and appeared to be lifeless. A male identified as 'Russell Jones' was on top of him trying to give CPR. I observed two other females on the side.

Emergency medical services soon arrived and "attempted to render aid" to Belin, but he was deceased. The medical examiner testified that Belin sustained a total of four gunshot wounds—one in "the anterior upper chest," one in "the right side of the lower abdomen," one in "the left side of the head," and one in "the left side of the back"—as well as "shrapnel injuries" in his left hand. According to the medical examiner, "each one of the gunshot wounds in and of themselves would have been fatal," but "the collective of all of them [was] what led to [Belin's] death."

Detective Gregory Pauch, a crime scene technician, testified that he collected 9mm shell casings from around Belin's body, "in the vicinity of the tennis courts," and in the roadway. Detective Pauch testified that some of the 9mm shell casings he discovered

were aluminum or metal, while others were brass, which led investigators to believe that two guns might be involved. At trial, the GBI firearms examiner testified that, after examining the shell casings recovered during the autopsy and the shell casings collected from the crime scene area, she was able to establish that all the shell casings were fired from Smith & Wesson 9mm pistols. However, the shell casings located inside and around the victim's body and in the common area, and the shell casings located in the roadway were fired from two different firearms. No weapons were found on the scene, and neither the murder weapon nor any other weapon involved in the shootings was ever recovered by law enforcement.

Law enforcement officers learned that Ward was driving a black Ford Explorer with New York plates on the night of the shooting. During the early morning hours of March 25, law enforcement officers located Ward and co-defendant Brooks at the home of Shayla George, and Ward was arrested and taken into

custody.[9] While he was in custody, Ward was swabbed for the presence of gunshot residue ("GSR"). At trial, Kimberly Jewett, a GBI expert in microanalysis, testified that GSR testing revealed "four particles characteristic of gunshot primer residue" on Ward's hands, which meant that "either he discharged a firearm or he was in the presence of a discharging firearm or he came into contact with an item whose surface bears GSR[,] which would be like a recently discharged firearm."

Shortly after Ward's arrest, law enforcement officers obtained and executed a search warrant at George's residence, and during their search, they located Brooks's cell phone, as well as a gray or silver Nissan Pathfinder parked inside the garage. George testified that Brooks drove the Pathfinder to her house on the night of March 24, and at some point during the night, he moved the vehicle into

_____

[9] At that time, Brooks was not a suspect in the shootings. When Detective Dickson later interviewed Brooks about the events of March 24, Detective Dickson came to suspect that Brooks was a second shooter and took him into custody during the interview.

the garage.[10] George also testified that Ward arrived at her house about "an hour and 45 minutes" after Brooks, but she did not know how Ward got there.

On the morning of March 25, law enforcement officers located Ward's Ford Explorer at a local park. After obtaining a search warrant for the Ford Explorer and removing its computer system—from which geolocation data was subsequently downloaded— law enforcement officers found a black handgun holster in the pocket behind the driver's seat, as well as personal items belonging to Ward, including Ward's driver's license. Law enforcement officers also swabbed the interior and exterior of the Ford Explorer to test for the presence of GSR, which testing revealed "four particles of gunshot primer residue" on the driver's side panel and steering wheel of the vehicle.

---

[10] Mason testified that she spoke to Brooks by phone on the night of the shootings, and she told him to park the Pathfinder in the garage at George's house because it was "linked" to Mason as the renter of the vehicle.

On March 30, 2021, law enforcement officers executed a search warrant at Ward's residence and located Ward's cell phone. Law enforcement officers then obtained search warrants for the cell phones of Ward, Brooks, and Mason. Detective Tyler Brown, who was admitted as an expert in geolocation analysis and forensic analysis of electronic data at trial, testified that he reviewed and analyzed the cell phone records in this case, as well as the geolocation data taken from the Ford Explorer. Detective Brown testified that the recovered data showed that, during certain periods of time, Ward's cell phone and the Ford Explorer were "synced up to" one another. According to Detective Brown, the data recovered from Ward's cell phone and the Ford Explorer also demonstrated that, between approximately 8:20 p.m. and 8:30 p.m. on the night of the shootings, Ward's cell phone and the Ford Explorer were positioned and traveled as follows: (1) the cell phone and vehicle were first located near Ward's residence; (2) the car and phone traveled near the parking lot of the common area by the tennis

16

courts, but did not remain in one spot; (3) the car and phone left the vicinity of the parking lot and common area—traveling out of the crime scene area and in the direction of the back of the subdivision; (4) the car and phone traveled near the common area and the entrance of the subdivision, "paused briefly," and then traveled in the direction of the exit of the subdivision; (5) the car and phone traveled near the area around the park where Ward's Ford Explorer was located, after which there was "no more data for the Ford Explorer"; and (6) the cell phone then traveled near the northern part of Paulding County. Detective Brown testified that, about 15 to 20 minutes after the shooting, Ward's cell phone "didn't communicate anymore, and it wasn't used." Additionally, Detective Brown noted that ten calls were exchanged between Mason and Ward between 8:30 and 8:45 p.m. on March 24, and 27 calls were exchanged between Mason and Brooks during the same timeframe.

Ward testified in his own defense at trial. According to Ward, on the evening of March 24, he had just "pull[ed] in the driveway" of

17

his house and had "run in" to "grab something out of [his] room" and then "leave again," when Avritte—who was outside in the backyard—called him on the phone. Ward was inside talking to Mason at the time, and Avritte said, "There's people out here asking for you and they're cursing or whatever." Ward said he did not think it was anything serious—he assumed it was "some of her little friends"—but he decided he would drive over to the common area, "see what's going on," and try to diffuse the situation. Ward testified that he got in his car and "went to the parking lot" by the common area, where he thought "it was going to be like a little situation with the kids that my siblings went to school with or whatever."

According to Ward, when he got to the parking lot, the following occurred:

> I went and I got out of the car and walked up the path— and started walking up the path and then I seen Mr. Belin and Ms. Rutledge and then I was just like—like, basically, I just asked him like, What's going on—or basically, What's your problem or whatever, and then he didn't really say nothing. He was like, Who's that and walked closer, and then he just lunged at me and hit me with the gun.

18

Ward testified that, after "Belin came at [him]" and "hit him with the gun," they "tussled for like maybe 15 seconds." Ward said he was not armed, but he "took the gun from" Belin, and then Belin "backed up maybe like five or 6 feet and then he just lunged at [Ward] again and that's when [Ward] shot him." Ward testified that he did not "have any intentions of fighting anybody," and he was just "defending" himself.

When Ward's trial counsel asked why several shots were fired, Ward responded that he was "scared for [his] life," so he "just shot until [Belin] dropped." After shooting Belin, Ward said he "dropped the gun and ran and hopped in [his] car and left." Ward testified that he thought about going back to his house, but he knew his "family [wa]s not going to be safe," so he "left the neighborhood" and went to the "courts at Ben Hill Park." Ward said he left his Ford Explorer at the park because he was "too shaken up to drive" and "asked a friend to drop [him] off" at George's house. Ward recalled leaving his wallet

19

and driver's license inside the Explorer, but testified that he did not know a gun holster was also in the vehicle.

On cross examination, Ward testified that he was "justified" in shooting Belin "because it was self-defense." Ward insisted that he was not in "like a heat of passion" nor had he "lost his control or anything." Ward said, "[I]t was him or me," and he "had to" shoot Belin. According to Ward, he was not sure where he shot Belin because he "didn't really look." Ward believed he shot Belin in the chest and "didn't know anything" about the shots to Belin's back, stomach, or head. Ward said he just "pulled the trigger" multiple times, acknowledging that he was responsible for shooting and killing Belin, but emphasizing that he shot Belin in "self-defense." Ward testified that he was aware that—other than his trial testimony—no other evidence or testimony had been presented to show that Belin was armed on the night of the shootings.

As for the second shooting on the night of March 24, Ward testified that he was not present, he "didn't shoot at nobody," and he

20

was not the one who shot Porter in the back. Ward admitted that the video recording from the Scoginses' house showed a black Ford Explorer driving towards the common area "right before the second shots" were heard and that he could hear the "second volley of gunshots" on the video. However, Ward insisted that he was "not there at the time of the second shooting."

1. On appeal, Ward contends that the trial court erred in failing to instruct the jury on voluntary manslaughter, see OCGA § 16-5-2 (a),[11] because his trial testimony constituted sufficient evidence of provocation for the issue of voluntary manslaughter to have been charged to the jury. We see no merit to this claim because there was not even slight evidence presented to support this charge. See *Smith v. State*, 296 Ga. 731, 737 (3) (770 SE2d 610) (2015) ("As

---

[11] OCGA § 16-5-2 (a) states, in pertinent part, that

[a] person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]

21

the evidence in this case does not rise to a level sufficient to support a voluntary manslaughter charge, the trial court did not err in refusing to give the charge requested.").

At trial, Ward submitted a written request to charge the jury on voluntary manslaughter. At the close of the evidence, the trial court held a charge conference and advised the parties that it would not give the voluntary manslaughter charge because Ward's trial testimony demonstrated that he did not shoot Belin as the result of "serious provocation which was sufficient to excite [sudden] passion in a reasonable person." The trial court did not charge the jury on voluntary manslaughter, and Ward objected.

Later, in denying Ward's motion for new trial alleging that the trial court's refusal to give this charge was error, the trial court rejected this claim, explaining that, to "merit a voluntary manslaughter charge as a lesser included offense of malice murder or felony murder," the evidence "must demonstrate the requisite provocation." The trial court determined that Ward failed to

22

demonstrate the "requisite provocation" at trial, and thus, the trial court properly denied Ward's request for a charge on voluntary manslaughter. We agree.

> If there is any evidence, however slight, to support a properly requested charge of voluntary manslaughter, then the trial court must give it. But a charge on voluntary manslaughter is warranted only where it can be shown that the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise.

*Thompson v. State*, 312 Ga. 254, 257-258 (2) (862 SE2d 317) (2021) (quoting *Beck v. State*, 310 Ga. 491, 496-497 (2) (852 SE2d 535) (2020)).

Here, there was not even slight evidence presented that could meet this standard. At trial, Ward testified that, on the night of March 24, 2021, Belin was armed with a gun when Ward encountered him in the common area, and the two men "tussled" before the shooting occurred. Ward then testified that he was

23

"justified" in shooting Belin "because it was self-defense," and when asked on cross-examination whether he shot Belin in the "heat of passion" or whether he had "lost his control," Ward plainly denied both, insisting that "it was him or me" and that he shot Belin because he was "scared for [his] life."

"This Court has repeatedly held that neither fear that someone is going to pull a gun nor fighting prior to a homicide are types of provocation demanding a voluntary manslaughter charge[,]" *Funes v. State*, 289 Ga. 793, 795 (2) (716 SE2d 183) (2011), and Ward points to no evidence whatsoever of provocation other than a tussle between him and Belin. "[A]cting out of fear is not the same as acting in the heat of a sudden irresistible passion[,]" id., "and only evidence of the latter supports a voluntary manslaughter conviction." *Burke v. State*, 302 Ga. 786, 791 (2) (809 SE2d 765) (2018). See also *Dugger v. State*, 297 Ga. 120, 123-124 (7) (772 SE2d 695) (2015) (holding that, where the appellant claimed that he shot the victim in self-defense, "not out of anger or other passion," and

24

there was no other evidence supporting a voluntary manslaughter charge, such a charge was not warranted). For these reasons, we conclude there was "no error in the trial court's failure to instruct the jury that it might consider voluntary manslaughter." *Thompson*, 312 Ga. at 258 (2).

2. Ward next contends that the trial court erred in denying his motion for a directed verdict on the aggravated assault and possession of a firearm during the commission of a felony counts related to the second shooting because the evidence was insufficient to establish that he was present when that shooting occurred. The record reflects that Ward did not move for a directed verdict at trial, so this enumeration is without merit. However, even if Ward had moved for a directed verdict, we disagree that the evidence was insufficient to support Ward's convictions for aggravated assault and possession of a firearm as a matter of constitutional due process.

Ward also argues that the verdict was repugnant because he was acquitted of the other aggravated assault charges related to the

25

second shooting.  We conclude that the verdict in this case was not

repugnant, see *Rutland v. State*, 315 Ga. 521, 522 (1) (883 SE2d 730)

(2023), and this claim also fails.

> The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction. Under this review, we leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, we do not reweigh the evidence, and as long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

*Ellington v. State*, 314 Ga. 335, 339 (2) (877 SE2d 221) (2022)

(citations and punctuation omitted).  See also *Jackson v. Virginia*,

443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)

(emphasis in original) (holding that, when evaluating challenges to

the sufficiency of the evidence as a matter of constitutional due

process, "the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational

26

trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

The evidence presented in this case established the following with respect to Ward's involvement in the second shooting: (1) Ward was driving a black Ford Explorer with New York plates on the night of March 24, 2021, which he later abandoned at a local park; (2) testimony from Ronnie Scogin and video footage captured from the Scoginses' exterior motion-sensitive camera established that, on the night of March 24—moments before the second shooting—a black Ford Explorer with New York plates drove past the Scoginses' house towards the common area, multiple shots were fired in the vicinity of the common area, and the Ford Explorer then drove out of the subdivision; (3) Jones testified that, right after the second shooting occurred, he carried Porter—who had been grazed by a bullet—back to the common area, and he saw "Ward "hop into" a car, which went "peeling off" away from the common area and drove out of the subdivision; (4) Karim testified that, "during the second shooting,"

27

she saw "a dark gray or a black van" in the common area; and (5) the GPS data from Ward's cell phone and the Ford Explorer confirmed that, around 8:30 p.m. on March 24, Ward's cell phone and his vehicle were in the crime scene area, moved out of the crime scene area, returned briefly to the crime scene area, and then left the subdivision.

The jury was "entitled to disbelieve" Ward's testimony that he was not involved with or present for the second shooting. *McKinney v. State*, 300 Ga. 562, 567 (2) (797 SE2d 484) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.") (citation omitted). Instead, the jury was entitled to believe the testimony from other eyewitnesses and the other evidence indicating that Ward left the common area in the Ford Explorer after the first shooting; drove back to the common area minutes later in the Ford Explorer; shot multiple times towards the common area where Belin was lying on the ground and other members of the group had congregated; and

28

drove out of the subdivision in his Ford Explorer. See id.

Accordingly, after properly viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient as a matter of constitutional due process for a jury to find Ward guilty beyond a reasonable doubt of aggravated assault against Belin and possession of a firearm during the commission of a felony against Rutledge. See *Jackson,* 443 U.S. at 319 (III) (B). See also *Boyd v. State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019).

Additionally, Ward's claim that the verdicts rendered in this case were repugnant is meritless. "'Repugnant verdicts occur when, in order to find the defendant not guilty on one count and guilty on another, the jury must make affirmative findings shown on the record that cannot logically or legally exist at the same time." *Rutland*, 315 Ga. at 522 (1) (citation and punctuation omitted). Here, the jury's verdicts were not repugnant. While the jury found Ward not guilty of aggravated assault as to Rutledge but guilty of possession of a firearm during the aggravated assault of Rutledge,

29

these verdicts could "legally exist at the same time," and the not guilty verdict does not require any specific findings by the jury. Id.

Instead, the jury's verdicts were "inconsistent." *Rutland*, 315 Ga. at 522 (1). "An example of 'inconsistent verdicts' is when a defendant is convicted of possession of a firearm during the commission of the crime of aggravated assault but found not guilty of aggravated assault." Id. "Although this Court once viewed inconsistent verdicts as impermissible, this Court now allows inconsistent verdicts to stand," because "it is not generally within the court's power to make inquiries into the jury's deliberations, or to speculate about the reasons for any inconsistency between guilty and not guilty verdicts." Id. (citation and punctuation omitted). See also *Coleman*, 286 Ga. at 295-296 (4) (concluding that, while the appellant "contends his conviction for possession of a firearm during the commission of the crime of aggravated assault of [the victim] cannot stand in light of his acquittal of the underlying felony," Georgia has rejected the "inconsistent verdict rule," and an

30

appellant can no longer "attack as inconsistent a jury verdict of guilty on one count and not guilty on a different count"). As such, we conclude that the jury's verdicts on the aggravated assault of Rutledge and possession of a firearm during the aggravated assault of Rutledge counts are permitted to stand.[12]

3. In Ward's final contention, he asserts that his trial counsel provided ineffective assistance by failing to file a motion under OCGA § 24-4-404 (b) to present "reverse 404 (b) evidence" related to Belin's propensity to carry firearms and by failing to object to the trial court's pretrial ruling granting the State's motion in limine regarding this issue. This claim of ineffective assistance of counsel fails.

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

---

[12] We question the continuing validity of our repugnant verdict caselaw in the wake of the United States Supreme Court's decision in *McElrath v. Georgia*, 601 U.S. 87, 95-96 (III) (144 SCt 651) (2024). However, our conclusion that the verdicts in this case were not repugnant means we need not reach the question here, and additionally, none of the parties raised this issue on appeal.

deficient, and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984)). "To prove deficient performance," a defendant "must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Taylor v. State*, 312 Ga. 1, 15-16 (6) (860 SE2d 470) (2021) (citations and punctuation omitted). See also *Robinson v. State*, 278 Ga. 31, 36 (2) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel," and "[a] reviewing court

evaluates trial counsel's performance from counsel's perspective at the time of trial."). Our assessment is an objective one, not based on the subjective views of trial counsel. See *Lane v. State*, 312 Ga. 619, 623 (2) (a) (864 SE2d 34) (2021) (noting that "we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct"; citation omitted).

"To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126 (2). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (citation and punctuation omitted). "In reviewing a trial court's ruling on an ineffective-assistance claim, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the relevant legal principles

33

to the facts." *Copeland v. State*, 316 Ga. 452, 457 (3) (888 SE2d 517) (2023).

(a) Prior to trial, the State moved to exclude any character evidence related to the witnesses, victims, and law enforcement officers in this case. The trial court held a pretrial hearing on the State's motions in limine on the first morning of trial. During the hearing, the prosecutor explained that the primary focus of the State's motion in limine was Belin's incarceration from late 2020 until early 2021, which the State anticipated would be addressed during trial because Belin's incarceration "impacted his relationship with [Rutledge]." The prosecutor indicated that the State would "affirmatively" discuss the fact that Belin was "locked up," but argued that the "general rule" still prevailed—i.e., "the character of witnesses, including victims, [was] not relevant." The prosecutor noted that the defense had not provided any discovery to the State, such as certified copies of convictions or any other documents that "could be used for proper impeachment," so the State believed that

"any bad character of witnesses, victims, any police officers" was "off limits."

In response, Ward's trial counsel argued that the defense had

some [photographs] of [Belin] with guns and [Ward's] defense [was] that Mr. Belin brought the gun to the party rather than [Ward], and [Ward] would like to use those [photographs] as evidence, not for character, but for propensity to carry a gun, and also the conviction for having a gun on school grounds. We believe it is relevant to our defense.[13]

The prosecutor responded that there had "not been any reverse [OCGA § 24-4-404 (b) ("Rule 404 (b)"] notice," and he believed "that would be required if [the parties were] going to go into—or there's going to be any attempt to make pertinent any specific instances of alleged prior acts."

In ruling on the State's motion in limine, the trial court agreed with the State that this "type of evidence would require maybe a 404

---

[13] The record reflects that Ward's trial counsel did not show any of the photographs or documentation pertaining to a gun-possession disposition to the trial court or the State during the pretrial hearing.

35

(b) notice, which requires [the defense] to put the State on notice."[14] The trial court also observed that it did not "know what exactly the relevance of that evidence would be at th[at] point" since Ward had not included self-defense in the requests to charge he filed before trial. The trial court granted the motion in limine, advising that,

> [i]f during the course of this case, something comes to light or there does appear to be a reason to revisit this, the court is certainly open to doing so if that becomes necessary, but that needs to be done outside the presence of the jury and [the parties] need to notify the court that [they] intend to do it prior to any attempts or any references to that.

At trial, Ward did not raise the issue of introducing any photographs or convictions of Belin as evidence.

In his motion for new trial, Ward contended that his trial counsel "provided ineffective assistance of counsel when counsel failed to file a [Rule 404 (b)] motion relating to [Belin's] propensity to carry firearms."[15] In support of this claim, Ward argued that "the

---

[14] We express no opinion as to whether a Rule 404 (b) notice to the State would have been required under these circumstances.

[15] Ward did not specify in his motion for new trial what evidence his trial

heart of [his] defense was self[-]defense," and thus, his trial "[c]ounsel's failure to properly file a motion to introduce the character of [Mr.] Belin related to the use of firearms under [Rule 404 (b)]" fell below "the standard of what a reasonable attorney would do under the circumstances and prejudiced Mr. Ward's ability to support his self-defense claim" because that evidence was "probative" of "whether a reasonable person under the circumstances would have felt threatened sufficiently to justify the use of deadly force."

At the motion-for-new-trial hearing, evidence was presented to show that Belin was arrested on May 25, 2018 and October 12, 2020 for, respectively: (1) possession of a firearm on school grounds after law enforcement discovered a firearm inside a motor vehicle associated with Belin parked at the local high school; and (2) possession of a firearm after law enforcement discovered a firearm inside a motor vehicle associated with Belin parked on a street

---

counsel should have sought to admit under Rule 404 (b).

where law enforcement officers were responding to a noise complaint.[16] Ward's trial counsel testified that, during trial preparation, investigators in the public defender's office ran a criminal history report for Belin and "check[ed] social media for anything that might be out there." Ward's trial counsel stated that, based on Belin's criminal history report, he was aware of Belin's May 2018 arrest "for firearm on school grounds." However, trial counsel indicated that, while he knew Belin had been incarcerated in late 2020 for a probation violation, he did not know how Belin's probation had been violated or that Belin had been arrested again in October 2020. Ward's trial counsel testified that he advised Ward before trial that evidence of Belin's May 2018 arrest "wasn't admissible because the judge had ruled on a motion in limine that it was not admissible," and the defense was "not going to be allowed to

---

[16] At the motion-for-new-trial hearing, the prosecutor advised the trial court that the State and Ward—through his motion-for-new-trial counsel—had "agreed to stipulate" that Belin was "in custody" for the October 2020 charge from October 12, 2020 until February 28, 2021, shortly before the crimes at issue occurred.

38

go into it." When trial counsel was asked whether he thought it would have been "proper to try and file a 404 (b) motion to try to get that evidence in" based on Ward's self-defense claim, trial counsel responded that he did not consider filing a Rule 404 (b) motion because he "didn't think it would do any good in view of [the trial court's] ruling on the motion in limine already." On cross examination, Ward's trial counsel confirmed that he argued during the hearing on the State's motion in limine that information about Belin's incarceration "should come in," but he "gathered from [the trial court's] ruling that [the court] was going to put a very tight [rein] on what [they] could get into with Mr. Belin," and "the gun was not one that I could get into."

In the order denying Ward's motion for new trial, the trial court noted that, during the motion in limine hearing, Ward's trial counsel stated that the defense had "some photographs" of Belin with guns and "a criminal case disposition for having carried a gun on school grounds" that the defense wanted to use at trial to show Belin's

"propensity to carry a gun," but Ward's trial counsel did not show the trial court any such photographs or documentation. The trial court observed that, in ruling on the State's motion in limine, the trial court advised the parties that it would "revisit the issue" at trial if "a reason were to arise" for the court to do so, but Ward's trial counsel "did not later request [the trial court] to revisit the issue." The trial court then noted that, at the motion for new trial hearing, "evidence was presented about 2 instances in which Mr. Belin had been arrested for having possessed, constructively, a firearm," but concluded that this evidence did not demonstrate that Belin "had a violent character trait" and would not have been "an essential element of [Ward's] self-defense claim." The trial court also concluded that this evidence did not "indicate that Belin had ever used a firearm offensively against another person" or that Ward "had been involved in either incident." The trial court further determined that evidence of Belin's arrests and any photographs of Belin with guns "would not have been admissible under [OCGA §§

24-4-404 (a) (2) or 24-4-405] to demonstrate that Mr. Belin had allegedly possessed a firearm during his fatal encounter with [Ward]."

On this basis, the trial court concluded that Ward's trial counsel was not deficient for electing not to file a Rule 404 (b) motion seeking to admit this evidence because "if the [d]efense had filed such [a] reverse Rule 404 (b) motion solely to try to show Mr. Belin's propensity for possessing a firearm, such purpose would have constituted sheer propensity evidence that [the trial court] would have been authorized to exclude from trial." The trial court also ruled that "any marginal relevance or probative value of that other act evidence would have been substantially outweighed by the danger of unfair prejudice" and, thus, "excludable under OCGA § 24-4-403." The trial court further determined that, "even pretermitting any deficiency in this regard, [Ward] ha[d] not established the prejudice prong" of *Strickland*.

41

On appeal, Ward contends that his trial counsel was deficient in conceding to the trial court's pretrial ruling on the State's motion in limine and in failing to file a Rule 404 (b) motion to introduce evidence of Belin's prior "gun charge" because this evidence was admissible to show "the character of Mr. Belin related to the use of firearms" and Belin's "propensity to carry firearms" and was relevant to Ward's self-defense claim.[17]  Ward further argues that his trial counsel's failure to seek to admit this evidence prejudiced Ward's ability to support his self-defense claim.  We see no merit to

---

[17] In his briefing, Ward does not mention any photographs of Belin "with guns"—i.e., the photographs referenced by his trial counsel during the motion in limine hearing—or argue that those photographs would have been admissible under Rule 404 (b) had his trial counsel filed the requisite Rule 404 (b) motion, so we assume Ward has abandoned any such claim on appeal.  See *Harris v. State*, 313 Ga. 653, 665 (6) n.13 (872 SE2d 732) (2022) (noting that appellant abandoned any claim that a *Brady* violation occurred with respect to records from his prior trial "by failing to make any argument in support of it on appeal") (citing former Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned.")).  Additionally, Ward does not make any argument or cite to any legal authority in support of his contention that his trial counsel was ineffective by failing to object to the trial court's pretrial ruling granting the State's motion in limine; thus, we assume this claim is similarly abandoned. See id.

these contentions, as Ward has not shown that this evidence would have been admissible at trial.

(b) First, although OCGA § 24-4-404 (a) (2) provides that "an accused may offer evidence of a pertinent trait of character of the alleged victim, for the purpose of proving action in conformity therewith," that evidence "is generally limited [by OCGA § 24-4-405 (a)] to testimony as to reputation or by testimony in the form of an opinion." *Copeland*, 316 Ga. at 458 (3) (b) (citing OCGA §§ 24-4-404 (a) (2) and 24-4-405 (a); punctuation omitted). See also *Wofford v. State*, 305 Ga. 694, 698 (2) (c) (827 SE2d 652) (2019) ("Character about a victim generally is limited to reputation or opinion, not specific bad acts."). And, in cases where an accused is arguing self-defense, the accused may *only* seek to introduce evidence of the victim's violent character through the admission of "reputation and opinion testimony." *Strong v. State*, 309 Ga. 295, 313-314 (3) (845 SE2d 653) (2020). We have held that "'specific instances' of a victim's conduct," *Copeland*, 316 Ga. at 458 (3) (b) (quoting OCGA §

43

24-4-405 (b)), are not admissible where the accused is arguing self-defense because "a victim's violent character is not an *essential element* of a self-defense claim." *Strong*, 390 Ga. at 313-314 (3) (holding that OCGA § 24-4-404 (a) "allowed [an a]ppellant to offer evidence of [the victim's] violent character, as that trait was pertinent to [the a]ppellant's claim of self-defense," but OCGA § 24-4-405 (a) required that this trait be "proved only with reputation and opinion testimony"; emphasis in original).

Here, to the extent Belin's purportedly violent character was pertinent to Ward's claim of self-defense at trial, Ward could only prove this character trait "by reputation and opinion testimony," which Ward never sought to do and does not argue his trial counsel should have done. *Strong*, 309 Ga. at 313-314 (3). See also *Beck*, 310 Ga. at 498 (3). Instead, Ward argues that his trial counsel should have sought to prove Belin's purportedly violent character through the admission of his prior gun charge, which was not admissible for this purpose. See *Strong*, 309 Ga. at 313-314 (3).

44

And, because Belin's prior gun charge was not admissible for this purpose, Ward's trial counsel was not deficient in failing to introduce evidence of this prior conviction at trial. See *Wofford*, 305 Ga. at 699 (2) (c) ("Absent a showing that these prior convictions would have been admissible at trial, [the appellant] cannot prove that his lawyer rendered ineffective assistance when he failed to present evidence of the prior convictions.").

(c) Additionally, we have held that "[s]pecific instances of a victim's past conduct may also be admitted, not to show the victim's action in conformity therewith, but rather [to] establish the defendant's state of mind and the reasonableness of the defendant's use of force." *Copeland*, 316 Ga. at 458 (3) (b) (citation and punctuation omitted). See also OCGA § 24-4-404 (b) (allowing evidence of "other crimes, wrongs, or acts" to be "offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim").[18]

---

[18] As we did in *Roberts v. State*, 305 Ga. 257, 260 (3) (824 SE2d 326)

45

However, "[b]ecause such evidence is offered as proof of the defendant's state of mind at the time of the charged crime, it is only admissible if there is proof that the defendant actually knew about the victim's prior acts at that time." *Copeland*, 316 Ga. at 458-459 (3) (b).

Here, there is no evidence that Ward "was aware at the time of the shooting[]" of Belin's 2018 conviction, "so the conviction[] would not have been admissible to show" Ward's "state of mind or the reasonableness of his conduct" when he shot Belin in March 2021. *Wofford*, 305 Ga. at 698 (2) (c) (citing OCGA § 24-4-404 (b)). Given that nothing in the record shows that Ward "actually knew" about Belin's prior conviction, *Copeland*, 316 Ga. at 459 (3) (b), or had "personal knowledge" of "any specific acts of violence" by Belin at the time the shooting occurred, Ward's claim of ineffective assistance based on his counsel's alleged failure to seek to introduce evidence

---

(2019), we again assume without deciding that Rule 404 applies to evidence regarding the other acts of a victim or third party.

of this conviction fails. *Beck*, 310 Ga. at 498 (3) (concluding that, only where "the defendant had personal knowledge" of "a victim's specific acts of violence," will those acts potentially "be admissible to show the defendant's state of mind with respect to self-defense").

For the reasons set forth above, we conclude that, because Ward failed to establish that "his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms," Ward has failed to prove that his counsel performed deficiently. *Ward*, 313 Ga. at 273 (4). See also *Copeland*, 316 Ga. at 456 (3) ("To overcome the strong presumption that counsel performed reasonably, the defendant must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not.") (quotation and punctuation omitted). Thus, Ward's claim of ineffective assistance of counsel fails.

*Judgment affirmed. All the Justices concur.*